50 N.J. Super. 201 (1958)
141 A.2d 558
PETER CERNIGLIA, PETITIONER-APPELLANT,
v.
THE CITY OF PASSAIC, RESPONDENT-APPELLEE.
Superior Court of New Jersey, Appellate Division.
Argued May 12, 1958.
Decided May 16, 1958.
*203 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Joseph P. Piscopo argued the cause for appellant.
Mr. James J. Skeffington argued the cause for respondent (Messrs. Skeffington, Haskins & Skeffington, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Petitioner appeals from a County Court judgment reversing a determination and award in petitioner's favor by the Workmen's Compensation Division and ordering that the petition be dismissed.
The County Court's order of dismissal was dated November 21, 1957 and filed the same day. On December 16, 1957 there was filed in the Superior Court Clerk's Office a petition for leave to appeal in forma pauperis (Docket AM-50-57). As a matter of courtesy  such petition is an ex parte matter and does not require notice to opposing counsel, R.R. 1:2-7(a); R.R. 2:2-5  petitioner served notice of motion for leave to proceed as an indigent, dated December 26, 1957, upon counsel for respondent. Thereafter, an order granting leave to appeal in forma pauperis, dated January 10, 1958, was filed on January 13, 1958. Notice of appeal was then filed on January 28, 1958.
Respondent contends, preliminarily, that the appeal should be dismissed as out of time, apparently under the misapprehension that December 26, 1957, the date on which it was served with the notice of motion, was the actual filing date of the petition for leave to proceed as an indigent. The point is without merit. Only 25 days elapsed from the County Court's order of dismissal to the filing of the petition for leave to appeal in forma pauperis. The running *204 of the usual 45-day period for taking the appeal, R.R. 1:3-1(b), was tolled during the pendency of the petition, and started to run again on January 10, 1958, the date of the determination of the application, R.R. 1:3-3(b). The notice of appeal was filed 18 days later, so that only 43 days of the permitted 45 had expired.
At the heart of this appeal lies the question of whether petitioner was in the employ of respondent at the time of the accident. We turn to the operative facts.
Prior to 1952 there were no suitable baseball recreational facilities for boys between the ages of 12 and 15 in the City of Passaic. There was a Little League for those under 12, and adequate facilities for those over 15. Thomas Cavanagh, the city recreation director, discussed the matter with Commissioner Cruise, Director of Public Parks and Public Property of Passaic, and the latter approved the setting up of a local Little Bigger League to serve boys in the 12-15 age group. However, Cruise specifically told Cavanagh there was no money in the budget to support such a special program, and unless funds could be raised by voluntary charitable contributions the project could not be undertaken.
Before the beginning of the 1952 baseball season Cavanagh got in touch with some civic-minded citizens who contributed money for the purchase of uniforms, bats, baseballs, and other needed equipment. Incidentally, this money was not sufficient to defray all expenses, and additional funds to meet the deficit were thereafter obtained by "passing the hat" at each game.
The Little Bigger League was in operation in 1952. A few full-time Recreation Department employees served as managers for some of the teams as part of their employment, since in any event they had to be at the parks during their summer schedule. In addition, a number of public-spirited citizens volunteered their services as managers or coaches for the remaining teams. None of them expected to be compensated for his services; in fact, it was definitely understood that no volunteer manager was to receive pay *205 for his time and effort. It should be mentioned that umpires (whose services could not be obtained gratis) were paid out of monies allocated to the Recreation Department, since the voluntary contributions of sponsoring citizens and monies collected at games did not meet league expenses. Cavanagh acted as executive director of the league and was in full charge of its operation, under the authority given him by his superior, Commissioner Cruise.
Petitioner's connection with the Little Bigger League began in 1953 when the manager of the team on which his son played was unable to continue in that capacity. Petitioner sought out Mr. Cavanagh and volunteered his services in managing the team. Like the other volunteer managers, he neither sought nor was allowed any payment or other consideration for his activities as manager; his name did not appear, either directly or indirectly, as an employee of the City of Passaic, nor was he approved as an employee by Civil Service.
Petitioner was in the cleaning and pressing business, and had a one-third interest in Clayton Cleaners, of Clifton, New Jersey. It appears that during the 1953 Little Bigger League season he requested Cavanagh to give him the season-end contract for dry cleaning the boys' baseball uniforms. However, the job went to another contractor at the end of the season. Cavanagh testified that in order to avoid criticism from prospective patrons of the league, he obtained prices from several cleaning establishments and gave the contract to the one with the lowest price.
Piqued because Clayton Cleaners had not gotten the 1953 cleaning contract, petitioner failed to show up for the annual spring practice of the league in 1954, nor did he appear at the first few games. Cavanagh thereupon got in touch with him to inquire whether he was planning to volunteer his services again. When petitioner told him he felt slighted because the cleaning contract had gone elsewhere after he had given all his time to the league gratis, Cavanagh explained that the practice was to give the contract to the lowest bidder. He urged petitioner to come back and work *206 with the boys and take the team for the 1954 season; "I assured him that I would see what I could do, all in my power, to see that he got the cleaning for that year." Cavanagh testified to similar effect on recross-examination. A reading of the entire typewritten record makes it quite clear that Cavanagh did not definitely promise petitioner that he would get the cleaning business in 1954. Indeed, he was completely without authority to make such a promise. All that he promised was, in his words, that he would do all in his power to see that he got the work.
Petitioner managed and coached the Little Bigger League team until August 29, 1954. The All-Star game between the best players of Passaic and Clifton was scheduled for that evening. Petitioner was present without previous arrangement, others having been designated to coach the All-Stars on that occasion. Although not listed as manager or coach, petitioner was pitching warm-up batting practice prior to the actual game. He lunged for a hit ball and immediately felt a pain in his chest. He was taken to the hospital and found to have sustained a coronary thrombosis and to have developed a myocardial infarction. He has been treated for that condition down to the present time. There was medical testimony connecting the heart attack with his efforts at the game.
This factual account should be completed by noting that at the close of the 1954 season the cleaning of the baseball uniforms was given to Clayton Cleaners, whose price this time was right.
The deputy director concluded there was an employment relationship between petitioner and respondent city and made an award. On appeal the County Court reversed, finding no employer-employee relation and additionally determining that Cavanagh was not legally empowered to hire petitioner as a municipal employee and had no intention of doing so when he spoke to him in the spring of 1954 in order to persuade him to return as a volunteer manager. The County Court found the services rendered by petitioner were voluntary. The judgment should be affirmed.
*207 The elective compensation provisions of the Workmen's Compensation Act arise out of agreements, either express or implied, between "employer and employee" to accept the statutory scheduled rates of compensation for personal injuries to, or for the death of, such employee by accident arising out of and in the course of his employment. R.S. 34:15-7. Under N.J.S.A. 34:15-36
"`Employer' is declared to be synonymous with master, and includes natural persons, partnerships, and corporations; `employee' is synonymous with servant, and includes all natural persons, including officers of corporations, who perform service for an employer for financial consideration, exclusive of casual employment, * * *."
Employment ordinarily presupposes a contractual relation; there must be a contract of hire, express or implied in fact. Bendler v. Bendler, 3 N.J. 161, 165 et seq. (1949). The burden of establishing all the statutory requirements rests upon the petitioner in compensation. Mahoney v. Nitroform Co., Inc., 36 N.J. Super. 116, 125 (App. Div. 1955), reversed on other grounds 20 N.J. 499 (1956). Petitioner has not sustained that burden, for he has failed to establish the employment relationship  a valid existing contract of hire  basic to a compensation claim.
The essential prerequisites to a valid contract of employment are entirely lacking in this case. All we have is the assurance given petitioner by Cavanagh that he would see what he could do to secure the dry cleaning contract for Clayton Cleaners at the close of the 1954 season. Ignoring for the moment Cavanagh's authority to engage petitioner as an employee of the respondent municipality, Cavanagh's conversation with petitioner in the spring of 1954 does not spell out an absolute promise to award the cleaning contract to petitioner in consideration of his return to the service of the team. Cf. Broad St. Nat. Bank of Trenton v. Collier, 112 N.J.L. 41, 44 (Sup. Ct. 1933). Certainly Clayton Cleaners could not have sued for breach of contract, or have legally enforced the words of encouragement Cavanagh gave petitioner.
*208 The record establishes that petitioner was simply a volunteer, acting out of civic and charitable motives. He understood, as did every other volunteer manager, that in undertaking to help the Little Bigger League he was to receive no pay whatsoever. The fact that he resumed his services in 1954, motivated partially by the hope induced by Cavanagh's promise that he would get the cleaning contract, does not raise the relationship to one of employer-employee within any fair signification of the statutory language. The compensation decisions uniformly exclude from the definition of "employee" those who neither receive nor expect to receive any kind of pay for their services. 1 Larson, Workmen's Compensation Law (1952), § 47.41, p. 696. Although normally there is an implication that payment for services is expected, "the performance of voluntary patriotic or charitable duties ordinarily leads to no presumption of expected payment." Ibid.
The cases relied upon by petitioner are readily distinguished on their facts. In each case there was present the performance of work for which one might ordinarily expect payment. A student nurse (Heget v. Christ Hospital, 26 N.J. Misc. 189, 58 A.2d 615 (C.P. 1948)); a janitor given a rent-free apartment (Britten v. Berger, 18 N.J. Misc. 215, 12 A.2d 875 (Dept. Labor 1940)); a house-keeper where payment for her services was made to her husband who also worked at the same place (Rojeski v. Pennington Dairy Farms, Inc., 118 N.J.L. 335 (Sup. Ct. 1937)); a golf club caddy paid by the players (Essex County Country Club v. Chapman, 113 N.J.L. 182 (Sup. Ct. 1934)), were all performing services which came within the sphere of what the courts, as well as the ordinary layman, consider employment. In none of those cases is there any suggestion that the services performed were voluntary, and in each the performance was under the control of those designated as employer. Cf. Frazer v. Martinsville Engine Co. No. 1, 23 N.J. Super. 389 (Cty. Ct. 1952); Armitage v. Trustees of Mt. Fern M.E. Church, 33 N.J. Super. 367 (Cty. Ct. 1954); Condon v. Smith, 37 N.J. Super. 320 *209 (App. Div. 1955), affirmed on the opinion below, 20 N.J. 557 (1956), where recovery was denied on a finding that the services rendered were voluntary within the meaning of N.J.S.A. 34:15-36.
In the present case, aside from the patent fact that there was never an intent to enter into a contract of hire between petitioner and respondent, none of the usual attributes of the claimed relationship are present. Petitioner was not on the city's payroll and it did not have that measure of control over the details of his work which the cases require. Petitioner was the coach, but he could come and leave whenever he wanted. He was not even expected at the All-Star game. There was no impelling reason why he had to be present at all times during practice; he coached the team as he thought best.
Although unnecessary to our determination, we agree with the arguments advanced by respondent that, all other considerations aside, there could be no valid contract of hire because there was no power in Commissioner Cruise or Cavanagh to engage petitioner as a city employee. Further, there was not even a budget allocation to support such a contract of hire. In either case, the contract  assuming there was one  would have been a nullity. Bendler v. Bendler, above, 3 N.J. at page 171; Bauer v. City of Newark, 7 N.J. 426, 434 (1951).
Affirmed.