80 N.J. Super. 129 (1963)
193 A.2d 163
HERMAN HAWKSFORD, PETITIONER-RESPONDENT,
v.
STEINBACHER PACKING CO., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 17, 1963.
Decided July 8, 1963.
*130 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Isidor Kalisch argued the cause for appellant.
Mr. Richard J. Levinson argued the cause for respondent (Messrs. Jacob, Alfred & Richard Levinson, attorneys).
The opinion of the court was delivered by GAULKIN, J.A.D.
Petitioner was denied workmen's compensation by the Division but the County Court reversed, in an opinion reported in 73 N.J. Super. 175. Steinbacher Packing Co. (Steinbacher) appeals. We affirm, but on somewhat different grounds.
The evidence shows that Hawksford had his own small meat route, making deliveries to his customers in a rented truck. *131 Steinbacher was a wholesaler. Hawksford came to Steinbacher's plant daily to buy meat for distribution to his customer's. One day, when Hawksford was at the plant to make such a purchase, Steinbacher asked him to cut up a quarter of beef for a customer who was in a hurry, Steinbacher's other butchers being out or engaged. While doing so, Hawksford was injured.
As the County Court said, the only question in the case is whether Hawksford was an employee as defined in N.J.S.A. 34:15-36 which provides:
"* * * `employee' is synonymous with servant, and includes all natural persons * * * who perform service for an employer for financial consideration, exclusive of casual employments, which shall be defined, if in connection with the employer's business, as employment the occasion for which arises by chance or is purely accidental; * * *."
As the County Court pointed out, Hawksford is entitled to compensation if he was performing the service for Steinbacher "for financial consideration"; financial consideration need not be in money, and, if Hawksford was an employee as defined in N.J.S.A. 34:15-36, his employment was not casual. Graham v. Green, 31 N.J. 207 (1959).
We hold that Hawksford was doing a service for Steinbacher in exchange for special concessions in his purchases of meat received from Steinbacher in the past and to be received in the future, and, in view of their economic relationship to each other and their course of dealing, that constituted service for financial consideration. 1 Schneider, Workmen's Compensation, § 227, pp. 600-601; 1 Larson, Workmen's Compensation, § 47.43(b), pp. 702-703; Killebrew v. Industrial Commission, 65 Ariz. 163, 176 P.2d 925 (Sup. Ct. 1947); Johnson v. Industrial Commission, 88 Ariz. 354, 356 P.2d 1021 (Sup. Ct. 1960); Gabel v. Industrial Accident Commission, 83 Cal. App. 122, 256 P. 564 (D. Ct. App. 1927); Aleckson v. Kennedy Motor Sales Co., 238 Minn. 110, 55 N.W.2d 696 (Sup. Ct. 1952); Boehm v. D.A. Sokol Hall Holding Corp., *132 274 App. Div. 954, 83 N.Y.S.2d 729 (App. Div. 1948), leave to appeal denied 298 N.Y. 931, 83 N.E.2d 866 (Ct. App. 1949); Johansen v. Gray, 283 App. Div. 647, 130 N.Y.S.2d 35 (App. Div. 1954); Gant v. Industrial Commission, 263 Wis. 64, 56 N.W.2d 525 (Sup. Ct. 1953). See also Smith v. Jones, 102 Conn. 471, 129 A. 50, 43 A.L.R. 952 (Sup. Ct. Err. 1925); Miller v. Chautauqua County Agricultural Corp., 279 App. Div. 1126, 112 N.Y.S.2d 560 (App. Div. 1952), motion for leave to appeal denied 280 App. Div. 902, 115 N.Y.S.2d 310 (App. Div. 1952), leave to appeal denied 304 N.Y. 988, 109 N.E.2d 473 (Ct. App. 1952); Rhodes v. G.H. Crandall Co., 4 A.D.2d 451, 167 N.Y.S.2d 101 (App. Div. 1957), leave to appeal denied 4 N.Y.2d 673, 171 N.Y.S.2d 1026, 148 N.E.2d 404 (Ct. App. 1958). Contra, Alexander v. J.E. Hixson & Sons Funeral Home, 44 So.2d 487 (La. Ct. App. 1950), but see Judge Ellis's dissent, and the comment on the Alexander case in 1 Larson, Workmen's Compensation, supra, § 47.43(b), p. 703; cf. Le-Co Gin Company v. Stratton, 241 Miss. 623, 131 So.2d 450 (Sup. Ct. 1961); Geraci v. Laloggia, 283 App. Div. 1127, 131 N.Y.S.2d 666 (App. Div. 1954). And see Brower v. Rossmy, 63 N.J. Super. 395 (App. Div. 1960), certification denied 34 N.J. 65 (1961); Marcus v. Eastern Agricultural Ass'n, Inc., 58 N.J. Super. 584, 596 (App. Div. 1959), reversed (adopting the dissenting opinion below) 32 N.J. 460 (1960); Hannigan v. Goldfarb, 53 N.J. Super. 190 (App. Div. 1958).
In Killcbrew v. Industrial Commission, supra, Verretto and Sullivan, partners, were baling hay for Walter A. Duncan. Duncan's son Jimmy helped the partners do the job. Further facts appear in the excerpt from the opinion quoted below. The question was whether Jimmy was an employee of the partnership. The court held that he was, saying:
"* * * While Jimmy Duncan deemed himself indebted to Verretto for favors in machinery lent to him in the past, he neither asked for nor received any compensation from Verretto or the partnership for his work as punch-back on the Walter Duncan job *133 of July 1, 1945. It appears from the testimony of Jimmy Duncan that he had worked for Verretto and Sullivan prior to said July 1, 1945, and had been paid 50¢ an hour * * * Jimmy Duncan testified:
`Q. I would like to know  was there any change in your relationship as to who was boss on the job on that day and in comparison with the days you worked and received pay for them? A. No, sir.
Q. You were working and Rusty (meaning Verretto) was the boss? A. Yes, sir.' [176 P 2d, p. 927]

* * * * * * * *
* * * He had previously been so employed and paid by Verretto and Sullivan for similar work. His employment at the time of the alleged accident was for exchange of services for favors, and the fact that the services were to be compensated for in some manner not by money does not make the contract for hire any the less legal and effective. * * *." (176 P.2d, at p. 928)
In Johnson v. Industrial Commission, supra, Johnson, a prisoner in the county jail, was "loaned" with other prisoners to respondent Arizona and Yuma County Fair, Inc., a private corporation. Johnson was, of course, fed and housed gratis while in the county jail. The consideration he received for working for respondent was primarily three days' credit on his sentence for each day worked. The respondent corporation fed and housed the prisoners while they were working for it, and gave them "sundries and cigarettes." Johnson was injured while working on the fair grounds. The court held he was an employee entitled to compensation:
"* * * In the instant case petitioner was at all times under the control of the employer, Yuma County Fair, Inc., which had the right to direct the manner in which the service was to be performed and the right to terminate petitioner's services.
Although petitioner was under duress in that he was a prisoner of Yuma County, there is nothing in this record to indicate that the actual services of these eight prisoners for the Yuma County Fair, Inc. was compulsory. As an additional inducement they were each given three-days credit for each day's work and seemingly were free to choose whether they worked or not. All the essentials of a contract for hire were present. Consideration flowed from the employer by way of different food and lodging, perhaps better, and sundries and cigarettes. Petitioner evidenced his agreement to the arrangement by performing the work tendered. * * *." (356 P.2d, at p. 1023).
*134 In Aleckson v. Kennedy Motor Sales Co., supra, Aleckson was an insurance broker with offices in Chicago, earning over $15,000 a year. Because of his daughter's health, his wife and daughter moved to Minnesota, while Aleckson continued to live in Chicago. Aleckson became acquainted with an officer of the Kennedy Motor Sales Company, a St. Paul car dealer, and learned that it purchased used cars in Chicago. As the opinion says, "an informal arrangement was made between them" whereby whenever Aleckson chose to come to Minnesota to visit his family, if the Kennedy Company had bought a car in Chicago which had to be driven to St. Paul, Aleckson could drive it in. Between June 1948 and March 1950 Aleckson drove at least 12 Kennedy cars from Chicago to St. Paul. He would leave Chicago Friday afternoon and arrive at his wife's residence Friday night. He would then use the car over the weekend for personal purposes such as shopping, taking his daughter to the doctor, sightseeing and going to the movies. On Sunday night, before leaving for Chicago on the train, Aleckson would deliver the car to the Kennedy Company sales lot and leave the car keys with a written statement of his actual out-of-pocket expenses for gasoline, oil and repairs, which were usually under $10, for which Kennedy reimbursed him. These amounts were the only sums received by Aleckson.
On one of these trips, Aleckson was killed. The court held that he was an employee of Kennedy and the death was compensable, saying:
"* * * The commission could reasonably find that Aleckson, in exchange for his services in driving and delivering the Cadillac to St. Paul, received the equivalent of wages in that he was thereby provided with a means of personal transportation from Chicago to Minnesota. He received something of computable value in that he did not have to pay for the gasoline and oil which he would have used had he driven his own car. He was also saved the wear and tear of his own vehicle, and upon arrival he had the use of the Cadillac in shopping for his family, taking his daughter to the dentist, going to church, and pleasure driving around the twin cities. * * *." (55 N.W.2d, at pp. 700-701)
*135 The opinion in Boehm v. D.A. Sokol Hall Holding Corp., supra, says that decedent was employed as a "casual porter," but gives no details. The accident happened after his regular hours of employment had terminated, but there was proof that he often performed some services after hours for which he was rewarded "by way of refreshments." His injury was held compensable.
In Gant v. Industrial Commission, supra, Gant and Hendrickson were neighboring farmers. One day, "Without the Hendricksons asking him to do so," Gant and his son came over and helped the Hendricksons do some of their farm work "because he could see that the Hendricksons were getting behind in their work." The court said:
"Nothing was said between the parties about paying Gant for the work he and his son had performed. However, the testimony disclosed that it was the custom among farmers of the community to exchange work. The fact that the Hendricksons had not offered to pay Gant for his services would tend to support the inference that the parties were observing such custom of exchange of work which prevailed in the community, that when one farmer helped out another, the latter would repay in equivalent services at some future time. The Hendricksons talked it over among themselves and decided they would help out Gant at some future date when he needed help in repayment for what he and his son had done." (56 N.W.2d, at p. 527)
Some months later Gant told Robert Hendrickson "it was getting awful late and he had a lot of corn standing in the field yet, so I [Robert] told him not to worry and to quit picking it by hand; that when I finished * * *, I would go over and pick it for him." Thereafter Robert went to Gant's farm with a mechanical corn picker, and while picking Gant's corn was injured. Nothing was said between Gant and Robert about paying for Robert's services. The court said this "tends to support the inference that Robert's services in picking corn for Gant, was in repayment for Gant's services the previous May in helping the Hendricksons," and was therefore compensable.
*136 In Gabel v. Industrial Accident Commission, supra, Gabel, a farmer, exchanged services with a neighboring farmer. A forest fire broke out and Gabel and his neighbors were engaged in fighting the fire. However, the neighbor with whom Gabel had been exchanging services asked him to take his truck and go to protect his farm buildings from the fire. While enroute, Gabel was injured. The court held it was compensable.
The evidence which leads us to the conclusion that the rationale of those cases applies to the case at bar is the following (all emphasis being ours):
Apparently Hawksford's route did not keep him very busy (he gave it up as not sufficiently profitable about two months after the accident) and, beginning about six months before the accident, he "helped out" Steinbacher from time to time. He testified:
"Q. What type of work would you do for them? A. Well, mostly delivering meat, helping load the truck and delivering one run, one delivery run.
Q. And would you deliver this merchandise in the trucks owned by the Steinbacher Packing Company? A. Yes, sir.
Q. Did you also help prepare the meat for these deliveries? A. Yes, I did.
Q. And in what way would you prepare the meats? A. Well, we had to get some meats that had to be cut up and put on the delivery 
Q. And  A.  and I helped route them.
Q. And who would give you the instructions to prepare the meat? A. Well, that would have been the boss; that was Mr. Steinbacher himself.
Q. And how would this procedure take place; I mean, would  A. Well, there'd be a group of us working together and we'd all pitch in and get that one run all ready for the truck.
Q. And would you be paid for this  compensated for doing this type of work? A. I'd be paid for the whole job, yes.
Q. In what way would you be paid, in money? A. In money, yes.
THE JUDGE: How much?
THE WITNESS: Well, he used to give me $15.00 every time I made the run for him.
THE JUDGE: That included preparing the meat, loading the truck and delivering to the customers?
THE WITNESS: That's right.
*137 THE JUDGE: Was it one truckload to a single customer or were there several customers?
THE WITNESS: No, several different customers.
THE JUDGE: Who decided when you were going to make one of these runs and how was it decided, if you know?
THE WITNESS: Well, when I used to go there, he'd be short a man during the day and he  Mr. Steinbacher himself  would ask me if I'd work for him for that afternoon, you know, after I got finished with my work, to make deliveries for him.

* * * * * * * *
THE JUDGE: And how was this salary decided?
THE WITNESS: Well, I usually took whatever he  we didn't figure on any set price.
THE JUDGE: Did it vary from time to time?
THE WITNESS: No, it was the same all through every day I went out for him.
THE JUDGE: And how often would this occur?
THE WITNESS: Well, it could happen  it was happening about once a week for a little while and then it dropped down to about once a month, and then ."
On cross-examination he testified:
"Q. Did you always understand you would get $15.00? A. Well, no, we didn't make no definite price on delivery.
Q. What  A. I could have asked for more if I wanted.
Q. Did you ever ask him for more?
A. No, I did not, but he used to give me a little break on the meat that I bought."
The judge of compensation then interrogated Hawksford about the work he was doing when he was injured:
"THE JUDGE: Did you understand that you were going to be paid for this service?
THE WITNESS: No; we didn't make no arrangements for payment or anything like that.
THE JUDGE: Well, did you feel you were going to be paid for it?
THE WITNESS: Well, in one way or another I did, yes.
THE JUDGE: What do you mean by that?
THE WITNESS: I'd get a special piece of meat or something like that that I wanted or something like that; like, usually, if they didn't have no nice calf livers or beef livers or anything like that in the morning, I come back in the afternoon and pick out some nice stuff like that, and he'd let me do it.
THE JUDGE: You take the meat for nothing, you mean?
*138 THE WITNESS: No, no; I'd have to pay for it, but I'd have a special 
THE JUDGE: This would be special meat that maybe an ordinary wholesaler that came in couldn't get?
THE WITNESS: That's right.
THE JUDGE: But because you had sort of an in, if I can use that term, you could get special cuts 
THE WITNESS: Yes, sir.
THE JUDGE:  that wouldn't be available to anyone?
THE WITNESS: Yes, sir.
THE JUDGE: Is that the way you expected to be paid for butchering this fore quarter?
THE WITNESS: Yes, sir.
THE JUDGE: All right."
Then the cross-examination resumed:
"Q. You just expected to get a special preference? A. Yes, sir.
Q. But this wasn't promised to you ahead of time? A. There never was anything promised; we never made arrangements like that on anything I did for him.

* * * * * * * *
Q. Well, did you consider this at the time, Mr. Hawksford, anything but a favor for the Steinbachers? A. Well, you could say it was a favor, but I don't think it's a favor if they give me a little special privilege on what I want to pick up because that's what I was down there for, the special privilege of picking out some good livers, good calf livers.
Q. Regardless of whether or not you had cut this, you would have gotten a special privilege that day, is that right? A. Well, that day I would have, yes. * * *"
He testified he had earned that right "for other things that I did for him." Then:
"THE JUDGE: Were these special cuts or choice cuts hidden from the general purchaser or concealed from the general purchaser in some way at this warehouse?
THE WITNESS: The livers are, yes.
THE JUDGE: How do they hide those?
THE WITNESS: They have a double ice box and there's  these livers are put in.
THE JUDGE: The usual customer isn't allowed to shop from there?
THE WITNESS: That's right.
THE JUDGE: Was that laid aside especially for you or were there other butchers that he had special entrees or cuts as well, if you know?
*139 THE WITNESS: I suppose he had some  that I wouldn't know.
THE JUDGE: Were you in a position where you could demand certain cuts by way of consideration for these odd jobs that you performed for Steinbacher?
THE WITNESS: No, I wouldn't say that. I'm not a demanding type anyway.
THE JUDGE: Was there any one way that they would set off your meat pick-ups against any work that you did, or was it a set-up where you just came in and picked out what you felt you wanted? No one kept a record of what you were buying, did they?
THE WITNESS: No.
THE JUDGE: What I'm trying to get at, in other words, was it a deal where they kept track of what you did for them and kept track of special cuts that you were getting?
THE WITNESS: No, they didn't do that.
THE JUDGE: If you were around, you'd help, and if they had meat that you wanted, even though the regular customer may not be able to get it, you got it?
THE WITNESS: Yes  well, sometimes I used to go in there, I mean, like they have beef marked up for different customers and if I had to have a special piece of meat for that day, they would take maybe a piece of meat from this customer and give it to me.
THE JUDGE: Even though it was reserved for another customer, if it met your particular need, they'd take it out of his order and give it to you?
THE WITNESS: That's right.
THE JUDGE: Whenever you saw something like that, whom did you see to make this arrangement?
THE WITNESS: Well, usually Mr. Steinbacher himself."
From the foregoing we conclude that the parties had established the practice of Hawksford's "helping out" Steinbacher whenever Steinbacher asked him to do so, for which Steinbacher paid him by giving him the concessions described plus $15 for each "delivery"; and that both doubtless intended that this practice should continue indefinitely.
Hawksford had placed himself at Steinbacher's beck and call. He testified that when Steinbacher "asked me to come to work * * * and then the man * * * came in that was supposed to make the run * * * then he told me he didn't need me for that day." As we have seen, a "delivery" entailed preparing the meat, loading a Steinbacher truck, etc., yet each time Hawksford made a "delivery" he accepted $15 *140 in payment, no matter how much work was entailed, even though he "could have asked for more."
Hawksford testified, in effect, that he "helped out" because Steinbacher gave him special treatment, which enabled him to get better and scarcer cuts and lower prices than other customers of Steinbacher. To Hawksford this was unquestionably "financial consideration"  i.e., money's worth. Hawksford doubtless obtained from his customers better prices and greater good will as a result of Steinbacher's special treatment. Had Steinbacher given Hawksford a 1% discount on his purchases because of Hawksford's "helping out," there could be no argument that it was "financial consideration" for Hawksford's "service." Or, had Steinbacher permitted Hawksford to store his truck or other property at his pleasure in Steinbacher's plant, it would have constituted "financial consideration." Rhodes v. G.H. Crandall Co., 4 A.D.2d 451, 167 N.Y.S.2d 101 (App. Div. 1957). We see no reason to apply a different rule here because Hawksford was given a general and indeterminate but constant and recognized special treatment rather than a fixed consideration.
And we conclude that the evidence establishes that, although there was no such agreement in so many words, Steinbacher gave Hawksford this special treatment in payment for Hawksford's help when needed, and that it intended to continue to give Hawksford such special treatment so long as Hawksford continued to render himself useful. Steinbacher must have known that was why Hawksford kept himself subject to Steinbacher's orders, took $15 for each "delivery" for work that often must have been worth more, and otherwise made himself obliging; and Steinbacher must have intended that it continue that way.
In short, from the course of dealing between the parties it is reasonable to assume that they understood that if Hawksford stopped being obliging the special treatment would stop (cf. Ferragino v. McCue's Dairy, 128 N.J.L. 525, 527 (Sup. Ct. 1942)), and that if Steinbacher stopped giving Hawksford the special treatment, it would lose an ever-ready spare *141 man willing to work cheaply. We hold that this understanding constituted a contract of hiring of Hawksford's service for financial consideration.
Steinbacher relies heavily on Cerniglia v. Passaic, 50 N.J. Super. 201 (App. Div. 1958). However, that case is plainly distinguishable because there only a hope was held out to Cerniglia by one who had no authority to bind Passaic that he would do what he could to obtain from Passaic the uniform cleaning contract for Cerniglia.
The judgment is affirmed.