888 A.2d 491 (2006)
382 N.J. Super. 227
Steven WALROND, Plaintiff-Appellant,
v.
COUNTY OF SOMERSET, Somerset County Police Academy, Detective William Solomons, Wayne Forrest, Somerset County Prosecutor, and Deputy Chief Richard Celeste, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 29, 2005.
Decided January 3, 2006.
*493 Michael J. Barrett, Woodbridge, argued the cause for appellant (Wilentz, Goldman & Spitzer, attorneys; Mr. Barrett, of counsel and on the brief).
Scott D. Rodgers, Somerville, argued the cause for respondents (Somerset County Counsel, attorneys; Mr. Rodgers, on the brief).
Before Judges KESTIN, LEFELT and HOENS.
The opinion of the court was delivered by
LEFELT, J.A.D.
The Chief of the South Brunswick Police Department (Department) assigned Officer Steven Walrond to serve one week as a "duty officer" at the Somerset County Police Academy. While serving at the Academy in this function, a lightning bolt struck Walrond causing severe personal injuries. Walrond was awarded workers' compensation benefits by the Department, but he also brought a civil action against, among others, the Academy and several members of its staff. Walrond alleged in the civil action that defendants were negligent for conducting an outdoor physical training session under dangerous weather conditions. The Academy moved for summary judgment. A motion judge found that Walrond was a "special employee" of the Academy and dismissed Walrond's civil suit on the ground that the Workers' Compensation Act, N.J.S.A. 34:15-1 to -128, constituted Walrond's sole remedy. Walrond appealed,[1] and we now reverse.[2]

*494 I.
The facts are straightforward and largely uncontested. The Academy holds its recruit training program on the campus of Raritan Valley Community College in North Branch. Campus classrooms along with the gymnasium, pool, and outdoor track are used during the training program. The Academy commonly invites officers from local municipalities to serve as "recruit duty officers" during the program. Many of these individuals had previously graduated from the Academy and have gone on to successful police officer careers. Walrond, for example, graduated from the Academy in 1996.
In June 2001, the Academy Director sent an "instructor request" letter to the Department's Chief "request[ing] the services of [Walrond] to assist in training at the [Academy]" as a "duty officer" for police recruits. The letter indicated that Walrond would be needed from August 13 through August 17, 2001, during the hours of 7:00 a.m. to 3:30 p.m. The letter requested the Chief to "check off whether or not the[] requests [could] be accommodated," photocopy the letter, and return it by July 13, 2001. The Chief checked "[a]pproved" and signed the letter.
Other than the letter, the record does not show that the Department and the Academy executed any formal agreement with regard to Walrond's services as a duty officer. In addition, Walrond did not enter into any written agreement with the Academy regarding his service as a duty officer. During his week at the Academy, Walrond was to be paid his regular salary by the Department. The Academy was not obligated to compensate Walrond or reimburse the Department for his services. Indeed, we were advised at oral argument that the Academy is funded by the several counties that participate in its program and that it collects tuition from the recruits.
The Academy's "Policies and Procedures Manual" provides a detailed description of the role and responsibilities of a "Recruit Duty Officer." These duties include ensuring the safety and security of vehicles and lockers used by the recruits during training; supervising the recruits while they eat lunch; monitoring recruit classes and breaks; engaging recruits "concerning their appearance, their behavior, their knowledge, etc."; reviewing recruit notebooks; looking out for unsafe conditions; and generally setting a good example for recruits to follow. If duty officers are certified in physical training, the manual further provides that they "will be dressed in the days [physical training] uniform" at the designated time.
During the first day of Walrond's assignment as "Recruit Duty Officer," he performed various tasks upon behalf of the *495 Academy. For example, he advised the recruits that he was there for them and that if they had any questions, they should feel free to ask him. He met with two recruits who had firearm issues, telephoned some instructors to remind them of their scheduled obligations, and graded some traffic tickets that had been prepared by the recruits.
Later that day, at around 2:00 p.m., the recruit class was scheduled to participate in an outdoor physical training session. These sessions generally involve running, calisthenics, and various other exercises.
Shortly before the session began, an Academy instructor informed Walrond that he could leave if he desired. However, Walrond told the instructor that he was scheduled by his chief to remain at the Academy until later that afternoon and he would therefore stay for the training session.
Because Walrond was not a certified physical trainer, he could not provide direct instruction to the recruits. However, he was permitted to encourage and assist the recruits during the session. At the time the session began, the weather was slightly overcast with a drizzle of rain falling; and thunder could be heard in the background. Academy instructors began the session by leading the recruits on a run around the track. As the run ended, a steady downpour of rain began to fall accompanied by thunder and lightning.
After completing the run, the recruits cooled down and then began calisthenics in the pouring rain. A lead instructor allegedly told Walrond that he enjoyed bad weather and that Walrond should look out for lightning. Nevertheless, the instructor subsequently decided to end the training session, and the recruits were ordered to march to a flag pole in the pouring rain and "bring down the colors." Walrond "went with [two recruits] for the purpose of supervising them [while taking down the flag]." This was the last thing Walrond remembered before he was struck by lightning at 3:01 p.m. and knocked unconscious.

II.
The Workers' Compensation Act provides an employee with an "exclusive remedy" against the employer for injuries "arising out of and in the course of the employment." Gore v. Hepworth, 316 N.J.Super. 234, 240, 720 A.2d 350 (App. Div.1998); N.J.S.A. 34:15-1, -7, -8. In exchange for receiving workers' compensation benefits, which are awarded without regard to fault, the employee surrenders common law tort remedies against his or her employer and co-employees, except for intentional wrongs. N.J.S.A. 34:15-8; Ramos v. Browning Ferris Indus., 103 N.J. 177, 183, 510 A.2d 1152 (1986).
Over the years, we have developed a doctrine that recognizes that under workers' compensation, an employee can "have two employers, both of whom may be liable in compensation. However, recovery against one bars the employee from maintaining a tort action against the other for the same injury." Antheunisse v. Tiffany & Co., Inc., 229 N.J.Super. 399, 402, 551 A.2d 1006 (App.Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989) (citing Blessing v. T. Shriver and Co., 94 N.J.Super. 426, 429-30, 228 A.2d 711 (App. Div.1967)); Scott v. Public Serv. Interstate Transp. Co., 6 N.J.Super. 226, 229, 70 A.2d 882 (App.Div.1950).
The doctrine developed largely from lent employment situations. Typically, for example, when a temporary employment agency lends one of its trained employees to a client of the agency, the lent employee may be considered to have been temporarily employed by the borrowing *496 employer for purposes of workers' compensation coverage. "Whether [a] common law action is precluded [against the borrowing employer] is ... dependent upon a determination that the borrower... is, in fact, a special employer." Blessing, supra, 94 N.J.Super. at 430, 228 A.2d 711.
In our case, as a further example, Walrond filed a workers' compensation claim against his general employer, the South Brunswick Police Department. He subsequently brought a negligence action against the Academy and several of its employees. "If it is determined that plaintiff was a lent employee or special employee of [the Academy] then the [tort] action may not be maintained." Murin v. Frapaul Constr., 240 N.J.Super. 600, 607, 573 A.2d 989 (App.Div.1990).
Our Supreme Court has recognized that "New Jersey has developed its special-employee doctrine by adopting the three-prong test recommended by Professor Larson for establishing a special-employment relationship." Volb v. Gen. Elec. Capital Corp., 139 N.J. 110, 116, 651 A.2d 1002 (1995)[3] (quoting Blessing, supra, 94 N.J.Super. at 430-31, 228 A.2d 711) (quoting 1A Arthur Larson, Workmen's Compensation § 48.00, at 710 (1966), and Jones v. George F. Getty Oil Co., 92 F.2d 255, 263 (10th Cir.1937), cert. denied sub nom. Associated Indemnity Corp. v. George F. Getty Oil Co., 303 U.S. 644, 58 S.Ct. 644, 82 L.Ed. 1106 (1938)).
The three-prong test renders the special employer liable for workers' compensation "only if: [1] The employee has made a contract of hire, express or implied, with the special employer; [2] The work being done is essentially that of the special employer; and [3] The special employer has the right to control the details of the work." Volb, supra, 139 N.J. at 116, 651 A.2d 1002 (quoting Blessing, supra, 94 N.J.Super. at 430-31, 228 A.2d 711).
To decide whether special employment exists, we have also utilized two additional factors. These additional factors ask "whether the special employer [4] pays the lent employee's wages; and [5] has the power to hire, discharge or recall the employee." Blessing, supra, 94 N.J.Super. at 430, 228 A.2d 711; Kelly v. Geriatric and Med. Servs., Inc., 287 N.J.Super. 567, 571-72, 671 A.2d 631 (App.Div.), aff'd o.b., 147 N.J. 42, 685 A.2d 943 (1996); see also Antheunisse, supra, 229 N.J.Super. at 402-03, 551 A.2d 1006.
Traditionally, the five factors are weighed to determine special employment. No single factor is "necessarily dispositive, and not all five must be satisfied in order for a special employment relationship to exist." Marino v. Ind. Crating Co., 358 F.3d 241, 244 (3rd Cir.2004) (citing Blessing, supra, 94 N.J.Super. at 433-34, 228 A.2d 711). Generally, however, it is believed that the most significant factor is the third: whether the special employer had the right to control the special employee. See, e.g., Volb, supra, 139 N.J. at 116, 651 A.2d 1002; Mahoney v. Nitroform Co., 20 N.J. 499, 506, 120 A.2d 454 (1956) (noting that the right to control is "essential" to the employment relationship); Gore, supra, 316 N.J.Super. at 241, 720 A.2d 350; Santos v. Std. Havens, Inc., 225 N.J.Super. 16, 22, 541 A.2d 708 (App.Div.1988) *497 (stressing the importance of the employer's "right to exercise a higher degree of authority" over any actual discretion exercised by the employee); Blessing, supra, 94 N.J.Super. at 430-31, 228 A.2d 711 (the "sheer weight of authority is undoubtedly on the side of `control.'").

III.
In this case, the motion judge found that Walrond was a special employee of the Academy because a "contract of hire may be inferred from Plaintiff remaining in the employment of the [Academy] for what was intended to be a one-week term." The judge also found that there was "little question that the work Plaintiff was doing at the time of the incident was the work of the Academy." In addition, the judge noted that "[w]hile the Plaintiff was present on the Academy grounds the sole people who could control the activities or give the Plaintiff assignments was Academy staff and not his superiors at the South Brunswick Police Department." Finally, the judge also determined "[i]t has not been demonstrated by the moving papers of either party that the Academy could not cut short the intended one week term if they were not happy with the performance of the Plaintiff or simply no longer required his services."
We do not quarrel with these findings, but note that conspicuous by its absence was any discussion of the fourth factor: whether the special employer pays the employee's wages? Though this factor is part of the usual five-part test to determine special employment, traditionally it has not been given great weight. In fact, we have previously stated that "this factor is not necessary for determination that a special employment relationship exists." Kelly, supra, 287 N.J.Super. at 577, 671 A.2d 631; (citing Volb, supra, 139 N.J. at 116, 651 A.2d 1002; Antheunisse, supra, 229 N.J.Super. at 403, 551 A.2d 1006).
The wage factor was discredited in Kelly, however, because "[t]he money used to pay [plaintiff's] wages came indirectly out of the fees paid by defendant for plaintiff's services." Ibid. Indeed, that is the nature of most special employment arrangements. As Professor Larson indicated, "the net result is almost invariably that the special employer ultimately pays for the services received and the employee ultimately gets his wages." Santos, supra, 225 N.J.Super. at 24, 541 A.2d 708 (quoting 1C Larson, Workmen's Compensation Law § 48.30, p. X-XXX-XXX (1986)).
Thus, indirect or direct financial consideration flows to the special employee from the special employer. In every case we have been able to identify, where our courts have found a special employment relationship, the special employer paid the special employee directly or indirectly through fees to the general employer. E.g., Pacenti v. Hoffman-La Roche, Inc., 245 N.J.Super. 188, 192, 584 A.2d 843 (App.Div.1991) (indirect payment)[4]; Gore, supra, 316 N.J.Super. at 241, 720 A.2d 350 (direct payment); Kelly, supra, 287 N.J.Super. at 577, 671 A.2d 631 (indirect payment); Santos, supra, 225 N.J.Super. at 24, 541 A.2d 708 (indirect payment); Antheunisse, supra, 229 N.J.Super. at 405, 551 A.2d 1006 (indirect payment); Chickachop v. Manpower, Inc., 84 N.J.Super. 129, 139, 201 A.2d 90 (Law Div.1964) (indirect payment). In this case, however, there is no compensation whatsoever flowing from *498 the Academy either to Walrond or to the Department.

IV.
In most workers' compensation statutes, "employee" is defined "to include every person in the service of another under any contract of hire, express or implied." 3-60 Larson's Workers' Compensation Law § 60.syn. (2005). Compensation is not specifically mentioned. In New Jersey, however, N.J.S.A. 34:15-36, defines "employee" as "synonymous with servant, and includes all natural persons, including officers of corporations, who perform service for an employer for financial consideration [.]"[5] (emphasis added). Service performed in exchange "`for financial consideration' is a cardinal legal requirement in [workers'] compensation for the creation of the status of employer and employee." Goff v. County of Union, 26 N.J. Misc. 135, 138, 57 A.2d 480 (Dept. Labor 1948). That services be rendered for "financial consideration" has been recognized as "the primary governing standard defining an employee[.]" Kraivanger v. Radburn Assoc., 335 N.J.Super. 169, 172, 762 A.2d 222 (App.Div.2000); Gross v. Pellicane, 65 N.J.Super. 386, 395, 167 A.2d 838 (Cty.Ct.1961) ("a prerequisite to the existence of an employment status is that there be a financial consideration flowing between the employer and the employee.").
Financial consideration, under the statute, need not be in the traditional form of a wage. Johnson v. The United States Life Ins. Co., 74 N.J.Super. 343, 349-50, 181 A.2d 380 (App.Div.1962). For instance, free board and lodging or a rent-free apartment have been held to constitute consideration given in return for services rendered. See Britten v. Berger, 18 N.J. Misc. 215, 12 A.2d 875 (Dept. Labor 1940); Simpson v. Vertty, 3 N.J. Misc. 9 (Dept. Labor 1925). In addition, benefits such as vocational instruction, training, and incidental equipment have also been deemed compensation. Heget v. Christ Hosp., 26 N.J. Misc. 189, 192, 58 A.2d 615 (Cty.Ct.1948) (finding that student nurse was employee of hospital even though she did not receive wages for her work).
Reimbursement or payment of expenses "could also be seen as a form of compensation when others who might be classified as `true volunteers' were not so compensated." Kraivanger, supra, 335 N.J.Super. at 172, 762 A.2d 222. In addition, "even where no specific salary or manner of payment is fixed, the law in a proper case may spell out an agreement implied in fact to pay for the reasonable value of the services rendered." Johnson, supra, 74 N.J.Super. at 350, 181 A.2d 380. Notably, "employee status for workers' compensation purposes exists if any financial consideration at all passes." Kraivanger, supra, 335 N.J.Super. at 172, 762 A.2d 222. In short, "financial consideration" includes anything of value to be received by the individual in return for his services, but not the hope of future favors. Hawksford v. Steinbacher Packing Co., 73 N.J.Super. 175, 180, 179 A.2d 181 (Cty.Ct. 1962), aff'd, 80 N.J.Super. 129, 193 A.2d 163 (App.Div.), certif. denied, 41 N.J. 195, 195 A.2d 466 (1963).
It is not necessary, to be considered an employee, to receive "financial consideration" directly from an employer. Rather, indirect compensation for services is sufficient to establish the employment relationship. Pickett v. Tryon Trucking Co., 214 N.J.Super. 76, 81, 518 A.2d 500 (App.Div.1986), certif. denied, 107 N.J. *499 149, 526 A.2d 210 (1987). In Pickett, for example, consideration passed from Tryon Trucking to a third-party who, in turn, paid petitioner for his services rendered to Tryon, and therefore, Pickett was found to be an employee of Tryon. Ibid.
In contrast, however, volunteers who act out of civic or charitable motives with no expectation of payment are not employees. Cerniglia v. City of Passaic, 50 N.J.Super. 201, 208, 141 A.2d 558 (App.Div.1958). "It is clear that one who volunteers his [or her] services and neither receives nor expects to receive payment is not an employee for workers' compensation purposes." Veit v. Courier Post Newspaper, 154 N.J.Super. 572, 574, 382 A.2d 62 (App.Div.1977) (citing Cerniglia, supra, 50 N.J.Super. 201, 141 A.2d 558; Armitage v. Trs. of Mt. Fern M.E. Church, 33 N.J.Super. 367, 110 A.2d 154 (Cty.Ct.1954); 1A Larson, Workmen's Compensation Law, § 47.41 (1973)). The Cerniglia court noted that "[t]he [workers'] compensation decisions uniformly exclude from the definition of `employee' those who neither receive nor expect to receive any kind of pay for their services." Cerniglia, supra, 50 N.J.Super. at 208, 141 A.2d 558 (citing 1A Larson, supra, § 47.41 at 696).

V.
In this case, Walrond was to receive his salary from the South Brunswick Police Department during his scheduled week as duty officer for the Academy. He remained in South Brunswick's general employment. However, the Academy provided Walrond no financial consideration whatsoever. He received neither wages nor non-monetary benefits for his work, such as additional training, equipment, or free room and board. Moreover, the Academy did not in any way compensate or reimburse the South Brunswick Police Department for Walrond's services. Unlike the petitioner in Pickett, it cannot be said that Walrond received even indirect consideration from the Academy for his services. In Marino where special employment was not found, Marino was paid by his general employer "for the duration of his work at the [borrowed employment]. [The borrowing employer] made no contributions to his wages or benefits, nor did it offer any payment to the [general employer] in exchange for Marino's work." Marino, supra, 358 F.3d at 253.
In our case, Walrond was a volunteer duty officer uncompensated by the Academy. Walrond cannot under the Workers' Compensation Act be considered an employee of the Academy, special or otherwise, and he is, therefore, not subject to the exclusivity provision of the Act. Accordingly, we reinstate Walrond's negligence suit and remand for further proceedings.
Reversed and remanded.
NOTES
[1] Walrond does not appeal the summary judgment in favor of the Somerset County Prosecutor "as plaintiff consented to the dismissal of this claim."
[2] Defendants, without filing a cross-appeal, also argued in their appellate brief that the motion judge erred when he found that plaintiff established a legally cognizable cause of action against defendants and that the Academy's physical training instructor did not have "discretionary activities" immunity under the New Jersey Tort Claims Act. In the absence of a defensive cross-appeal, however, these issues are not properly before us. See Campagna v. Am. Cyanamid Co., 337 N.J.Super. 530, 550, 767 A.2d 996 (App.Div.), certif. denied, 168 N.J. 294, 773 A.2d 1158 (2001); Sikes v. Twp. of Rockaway, 269 N.J.Super. 463, 465-66, 635 A.2d 1004 (App.Div.), aff'd o.b., 138 N.J. 41, 648 A.2d 482 (1994). In any event, we agree substantially with the motion judge's resolution of both of these issues, and if they were properly before us, would affirm.
[3] Volb is not directly relevant to the issue we explore herein. The issue in Volb "concerns the immunity from tort liability of a general employer ... for the alleged negligence of its employee ... which occurred while the employee functioned as a special employee." 139 N.J. at 113, 651 A.2d 1002. In Volb, the negligent special employee injured a co-employee who had no relationship with the special employee's general employer, against whom the suit was brought. Id. at 114-15, 651 A.2d 1002.
[4] Pacenti is included in this list because we found "it all but impossible to disagree with the trial judge's finding" of special employment, even though we declined to affirm summary judgment and remanded because of a factual dispute. 245 N.J.Super. at 192-93, 584 A.2d 843.
[5] Excluded from this definition are only "employees eligible under the federal `Longshore and Harbor Workers' Compensation Act,'" and "casual employments."