

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-16-2003

# Roma v. USA

Precedential or Non-Precedential: Precedential

Docket No. 02-3820

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation
"Roma v. USA" (2003). *2003 Decisions*. Paper 231.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/231

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 16, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-3820

MARK ROMA, and his wife,
MELANIE ROMA,
                    Appellants

v.

UNITED STATES OF AMERICA; UNITED STATES
DEPARTMENT OF THE NAVY; NAVAL FIREFIGHTER
CAPTAIN; JOHN DOE; CONTRACTOR JOHN DOE; FIRE
CHIEF JOHN DOE; BATTALION CHIEF JOHN DOE; JOHN
DOE ENTITIES, (1-10), jointly, severally or in the
alternative; J.A. JONES MANAGEMENT SERVICES, INC.
t/a Jones Management Services; VASPOLI CUSTOM
BUILDERS, INC. t/a Vaspoli Custom Builders; WIGAND
AND SONS, previously identified as John Doe Contractor
I, jointly, severally or in the alternative

v.

WILLIAM GREEN, d/b/a Green Carpentry;
GREEN CARPENTRY, INC.; HARLEYSVILLE INSURANCE
COMPANY

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
D.C. Civil No. 99-cv-05080
District Judge: The Honorable Mary Little Cooper

Argued: July 15, 2003

Before: McKEE, BARRY, and ROSENN, *Circuit Judges*

(Opinion Filed: September 16, 2003)

—————

Ross Begelman, Esq. (Argued)
Begelman & Orlow
411 Route 70 East, Suite 245
Cherry Hill, NJ 08034

*Attorney for Appellants*

Stephen R. Dumser, Esq. (Argued)
Gercke, Dumser, Shoemaker &
 Sierzega
1236 Brace Road, Suite E
Cherry Hill, NJ 08034

*Attorney for Appellee J.A. Jones*
*Management Services, etc.*

J. Andrew Ruymann, Esq. (Argued)
Assistant U.S. Attorney
Office of the United States Attorney
402 East State Street
Trenton, NJ 08608

*Attorney for Appellee*
*United States of America*

—————

## OPINION OF THE COURT

—————

BARRY, *Circuit Judge*:

Appellant Mark Roma suffered smoke-inhalation injuries on November 24, 1997 while fighting a hangar fire at the United States Naval Air Engineering Station in Lakehurst, New Jersey ("NAES Lakehurst"). Roma's second amended complaint alleges thirteen counts of negligence against numerous defendants, including the United States, the Navy, several unidentified Navy firefighters, and other federal employees (collectively, "the federal defendants"), as well as the civilian contractors working on the hangar roof renovation project where the fire occurred. In essence, the complaint alleges two distinct tort claims at issue on appeal: (1) the federal defendants and the civilian

contractors are liable for negligently starting the fire or failing to prevent it; and (2) the federal defendants are liable for Roma's injuries because they negligently instructed him to remove his self-contained breathing apparatus ("SCBA") on the night of the fire.[1]

Roma now appeals from the District Court's September 5, 2002 order granting motions for summary judgment by the federal defendants and two of the civilian contractor defendants, J.A. Jones Management Services, Inc. ("J.A. Jones") and Vaspoli Custom Builders, Inc. ("Vaspoli"). We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.[2] For the reasons which follow, we will affirm that portion of the District Court's order granting summary judgment as to the federal defendants, but will reverse that portion of its order granting summary judgment as to J.A. Jones and Vaspoli.

## I.

Mark Roma joined the East Dover Township Volunteer Fire Department, located in East Dover, New Jersey, in 1991, and was an active member of the department until he left to join the Army in October 1995. Roma again became an active member of the department after he was

---

1. The complaint also asserted a loss of consortium claim on behalf of appellant Melanie Roma. Since the Romas did not address the District Court's dismissal of this claim in their brief, we do not address it in this opinion.

2. After Roma filed his notice of appeal, the Clerk's office, *sua sponte,* raised an issue of appellate jurisdiction regarding the timeliness of the notice of appeal. The notice of appeal was filed on October 2, 2002 — after the District Court's September 5, 2002 Memorandum and Order granting summary judgment, but before the District Court entered a final order on October 9, 2002 dismissing all remaining counter-claims, third-party claims, and cross-claims as moot and closing the case. "[A] premature notice of appeal filed after disposition of some claims before a district court, but before the entry of final judgment, will ripen upon the court's disposal of the remaining claims," absent any showing of prejudice to the appellee. *Lazy Oil Co. v. Witco Corp,* 166 F.3d 581, 585 (3d Cir. 1999) (citing *Cape May Greene, Inc. v. Warren,* 698 F.2d 179 (3d Cir. 1983)). As there is no prejudice alleged by appellees, we have jurisdiction over the appeal.

honorably discharged from the Army in August of 1997. As an active member of the East Dover Fire Department, Roma took several firefighter training classes and participated in fighting hundreds of fires.

From September 22, 1983 through at least the date of Roma's alleged injury, the Board of Fire Commissioners for Dover Township, District No. 1, which included the East Dover Fire Department and the NAES Lakehurst Fire Department, were parties to a written mutual aid fire fighting assistance agreement, in which each party agreed to provide fire fighting assistance to the other party when requested, if the requested personnel and equipment were available. The agreement further provided that if assistance was rendered, "[t]he senior officer of the fire department of the requesting service shall assume full charge of the operations." The agreement also included a waiver provision, stating that "[t]he parties hereto waive all claims against every other party for compensation for any loss, damage, personal injury, or death occurring in consequence of the performance of this agreement."

On the afternoon of November 24, 1997, at approximately 2:00 p.m., a fire broke out on the roof of Hangar No. 1 at NAES Lakehurst. Hangar No. 1 was an enormous building — approximately 960 feet long, 350 feet wide, and over 220 feet high — which had once housed the Hindenberg and had been designated as a national historic monument. After the NAES Fire Department arrived at the scene and realized the magnitude of the fire, mutual aid assistance was requested from fire departments in the surrounding communities. Nineteen fire companies comprising 140 mutual aid personnel responded to NAES Lakehurst's call, including the East Dover Fire Department.

The hangar fire was burning between the two roofs of Hangar No. 1, where Vaspoli had been doing renovation work to enlarge the roof's drainage gutters. The firefighters worked to contain the fire both from the inside and from on top of the roof. In order to manage the many mutual aid firefighters fighting such a large fire on the roof of such an enormous building, the NAES Lakehurst Fire Department put an Incident Command System in place with Acting Assistant Chief of the NAES Fire Department, Joseph

Catapano, serving as the overall commander and other NAES Fire Department supervisors directing the firefighting activities in particular areas.

According to Roma, he and six other volunteer firefighters from the East Dover Fire Department, led by a Lieutenant Cheblowski, responded to NAES Lakehurst's call for assistance. Soon after their arrival, an NAES Lakehurst firefighter instructed Lieutenant Cheblowski to send three firefighters to the hangar, and Cheblowski sent Roma and firefighters Jay Melby and Dave Carus. As they approached the hangar, an NAES Lakehurst firefighter instructed them to cover some flight simulators in the hangar with tarps. Once they covered the flight simulators, they were sent back to their truck.

Roma testified that as he, Melby, and Carus passed the main command vehicle on their way back to the truck, they were told by either the NAES Lakehurst Chief or Assistant Chief to retrieve their SCBAs and tools and report back to the hangar because additional assistance was required on the roof. When they got to the East Dover truck, they explained to Lieutenant Cheblowski what they had been told to do, and Cheblowski instructed them to follow those instructions. The three then reported to the base of the hangar elevator shaft transporting firefighters and equipment to the roof.

When Roma arrived at the roof with Melby and Carus, an NAES Lakehurst firefighter instructed them to drop their SCBAs, get into harnesses, and go out onto the roof. When Roma questioned the order to remove his SCBA, he was told by the NAES firefighter that it was not needed on the roof, and was not allowed. Roma followed the order and left his SCBA in a pile of 20 or 30 SCBAs lying at the top of the elevator. None of the many firefighters making their way onto the roof from the top of the elevator was wearing an SCBA. Roma then followed another order (apparently from the same NAES firefighter at the top of the elevator) to deliver some saws to other firefighters working on the roof. After he made his way out onto the roof, Roma delivered the saws to a group of 20 to 30 firefighters. None of those firefighters was wearing an SCBA.

After delivering the saws, Roma was told to help out on the roof wherever needed, and began passing additional tools to the firefighters working on the roof trench. Then, according to Roma, two NAES firefighters in white hats directed him to relieve a firefighter who was sitting in a square hole in the roof, spraying water from a fire hose down into the hole onto the wooden subroof below. The wooden subroof was not simply exposed wood, but was coated with a rubber roofing material, similar to shingles, and had been the top roof before the metal roof was added.

Roma followed these instructions, took his place in the hole, and began spraying water onto the wooden subroof. According to him, when he began spraying, the wood was not on fire and he did not notice any smoke coming from the hole. Just before he was relieved, however, Roma testified that "some steam, it seemed like, it wasn't even smoke, it was steam, like a mist, started coming back at me as they were cutting trenches further down." Although Roma stated that the steam or mist disappeared after a couple of minutes, he inhaled some of it first.

Roma was relieved by other firefighters shortly thereafter and made his way to the elevator. On his way back across the roof, he observed white steam or misty smoke rising from holes in the roof. Roma testified that there were then approximately 60 firefighters working on the roof, and he did not see a single one wearing an SCBA. When he arrived at the elevator, Roma retrieved his SCBA, took the elevator back to the ground floor, and had a sandwich and some juice with other firefighters in the rehabilitation area.

Roma then returned to the East Dover fire truck, which was soon released by the incident commander. On the way back to the East Dover fire station, he began to cough up blood. Once back at the station, a first aid squad was called, and he was transported to the hospital, where he remained for a day or two.

The fire on the roof of Hangar No. 1 started in the course of drainage renovation work being done on the roof by Steven Vaspoli, Bill Green, and Lane Friesen, employees of Vaspoli, who in turn had been subcontracted the work by J.A. Jones. As the general contractor and the only party

with a direct contract with the government, J.A. Jones was responsible for quality control, and supervised and directed Vaspoli to ensure that it performed the work in accordance with the government's contractual requirements. For example, J.A. Jones provided Vaspoli with a Safety and Health Plan which identified hazards of the project and required certain safety controls. A J.A. Jones employee also visited the job site daily to inspect progress on the project and ensure it was being completed in accordance with contractual requirements.

In addition to frequent inspections by J.A. Jones, Vaspoli was required to obtain a Hot Work Permit from an NAES Lakehurst Fire Department inspector when necessary on any given day. According to Buck Shimp, the fire inspector who issued the vast majority of the permits to Vaspoli, a Hot Work Permit was required any time spark-producing equipment or an acetylene torch was used on the roof project. According to Mr. Vaspoli, however, a Hot Work Permit was only required on days his crew was using an acetylene torch. In any event, an NAES fire inspector issued a Hot Work Permit to Vaspoli on nearly every day that it was working on Hangar No. 1., including the day of the fire. For fire prevention purposes, and to satisfy Hot Work Permit requirements, Vaspoli kept two fire extinguishers and several buckets of water on the roof of the hangar on every work day, and had an employee keep fire watch on the ground on those days that its crew was using the torch.

The roof drainage improvements involved cutting into the existing metal roof to make space for a larger gutter, and then covering the new plywood gutter with rubber roofing material. In order to cut through the metal roof, Vaspoli used a gas-powered demolition saw (also called a "chop saw") which gave off sparks as it cut into the metal roof. J.A. Jones's inspector, the government project inspector, and the NAES Lakehurst fire inspector were all aware that the chop saw gave off sparks when it came into contact with the roof. At no time did any of these individuals advise Mr. Vaspoli to use a different kind of saw due to a risk of fire.

After Mr. Vaspoli and his co-workers had completed one third of the gutter work on the west side of the roof, they

discovered, in the ten to twelve-inch space between the metal roof and the wooden subroof, boxes and packing material that had been left behind several years earlier by the contractor who had originally installed the metal roof over the wooden subroof. Vaspoli removed the trash, which filled approximately 15 industrial garbage bags, and informed J.A. Jones, in daily notes, and the naval project inspector, that trash had been found and requested instructions about what to do with it.

Vaspoli only found and removed trash on that one day while working on the west side of the roof, and did not encounter any more trash until it began work on the east side of the roof. Mr. Vaspoli explained that it was impossible to know whether there was trash under a particular portion of the roof until that portion was actually cut and removed. At no time did Mr. Vaspoli contemplate that the trash might present an increased risk of fire. Neither did Keith McDonough, the government quality control inspector, who visited Vaspoli's work site every day of the project, even conceive of the possibility that the trash presented an increased risk of fire.

The day of the fire, November 24, 1997, the Vaspoli crew started in the morning with a "burn," using an acetylene torch to cut a steel roof beam. After lunch, they began cutting the next 30 feet of the roof to prepare it for the roofing contractor. At around 1:30 p.m., as they began to lift the roof panels that had just been cut by the chop saw, they noticed smoke coming from below where the roof had been cut but the metal panels not yet removed. When they removed the panels from that area, they observed a small fire on top of the wooden subroof. They lifted another panel and smoke poured over them. They then emptied the two fire extinguishers and poured the buckets of water on the fire, but the smoke did not subside. They pulled the fire alarm, radioed their man on the ground to tell him there was a fire, and evacuated the roof.

On January 22, 1998, Roma submitted to the Navy the administrative claim form required to make a claim under the Federal Tort Claims Act, Standard Form 95 (SF-95), seeking damages for the injuries he suffered fighting the November 27, 1997 fire. In that SF-95, Roma described the

basis for his claim as follows: "During fire emergency claimant was ordered to remove breathing respirator. As a result of same, claimant sustained significant damage to his respitory [sic] system, (note - claimant was a volunteer firemand [sic] for Dover Township Fire Department." In the space for the amount of the claim on the SF-95, Roma filled in the word "unknown."

In a letter dated March 23, 1998, a representative of the Navy Legal Service Office Mid-Atlantic advised Roma's counsel that the administrative claim was invalidly presented because it failed to include a specified damages amount, adequate information to allow for an investigation, or medical records or bills documenting Roma's injuries. On April 14, 1998, the Navy received Roma's second or amended SF-95, which included a specified damages amount of $1,000,000, and restated essentially the same basis for the claim — that is, that Roma "was instructed to remove his breathing apparatis [sic] and was injured as a result of same while trying to 'fight' the fire . . . ."

In a letter dated July 22, 1999, the Navy denied Roma's administrative claim. The letter stated that "[a] thorough examination of the facts of this claim indicates the United States is not liable under the Federal Tort Claims Act. There is no evidence of negligence on the part of the United States or a Government employee."

## II.

Roma challenges the District Court's grant of summary judgment on three grounds: First, he argues that the District Court improperly concluded that the New Jersey "fireman's rule" barred his claims against the contractors and the federal defendants based on their negligence in starting the fire or failing to prevent it. Second, he contends that the District Court erred in dismissing his FTCA claim against the United States for its negligence in preventing the fire because he failed to allege this claim in his amended administrative claim form. Third, he argues that the District Court erred in finding that the undisputed facts showed that he was a "special employee" of the NAES Fire Department on the night of the fire, precluding his claim for

damages against the United States under New Jersey's statutory workmen's compensation scheme, N.J. Stat. Ann. § 34:15-1, *et seq.*

We exercise plenary review over the District Court's grant of summary judgment, and accordingly apply the same standard as the District Court. *Wastak v. Lehigh Valley Health Network*, 333 F.3d 120, 124 (3d Cir. 2003). That is, summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 580 (3d Cir. 2003).

## A.

We begin by addressing Roma's argument that the District Court incorrectly concluded that his claims against the federal defendants, Vaspoli, and J.A. Jones for their negligence in starting or failing to prevent the fire were barred by the New Jersey fireman's rule. According to the fireman's rule, "the owner or occupier [of a premises] is not liable to a paid fireman for negligence with respect to creation of a fire." *Krauth v. Geller*, 157 A.2d 129, 130 (N.J. 1960). In holding that the fireman's rule applied to Roma's claims, the District Court relied upon *Kelly v. Ely*, 764 A.2d 1031, 1034-35 (N.J. Super. Ct. App. Div. 2001), *certification denied*, 772 A.2d 937 (N.J. 2001), in which the Appellate Division of the Superior Court of New Jersey held that N.J. Stat. Ann. § 2A:62A-21, passed by the New Jersey Legislature in 1994, did not abolish the common law fireman's rule, but only partially abrogated it.

We agree with Roma that *Kelly*'s holding is inconsistent with the plain language of section 2A:62A-21, which certainly appears to have abolished the fireman's rule in its entirety and, therefore, cannot be used as an accurate predictor of how the Supreme Court of New Jersey would

interpret the statute. In order to properly explain this conclusion, it is first necessary to provide some limited background on the origin of the New Jersey fireman's rule and its subsequent permutations.

The fireman's rule was first applied as a common law principle by the Supreme Court of New Jersey in 1960. *Krauth*, 157 A.2d at 130. The Court recognized that application of the rule was, in essence, a "policy decision [ ] that it would be too burdensome to charge all who carelessly cause or fail to prevent fires with the injuries suffered by the expert retained with public funds to deal with those inevitable . . . occurrences." *Id.* at 131. The Court also noted an analogous non-economic justification, reasoning that firefighters, in choosing their profession, willingly accept the risks engendered by others' negligence in starting fires, and thus "cannot complain of negligence in the very occasion for [their] engagement." *Id.*

Whatever its policy justifications, New Jersey courts substantially broadened the rule over the next thirty years. In 1979, the rule was applied to volunteer firefighters, *Ferraro v. Demetrakis*, 400 A.2d 1227, 1229 (N.J. Super. Ct. App. Div. 1979), and in 1983 to the negligence claims of police officers. *Berko v. Freda*, 459 A.2d 663, 666 (N.J. 1983). Then, in 1991, the Supreme Court of New Jersey further broadened the fireman's rule, holding that, in addition to barring liability for negligent acts which caused the fire or emergency, the rule also barred liability where the injuries arose from other negligent acts by third parties, unrelated to the fire or emergency, that firefighters and police officers in the normal course of their duties should expect to meet. *Rosa v. Dunkin' Donuts of Passaic*, 583 A.2d 1129, 1133 (N.J. 1991) ("To hold otherwise creates artificial distinctions between the negligence that occasioned one's presence and the negligence defining the scene at which one arrives . . . .").

In 1994, the New Jersey Legislature intervened, passing N.J. Stat. Ann. § 2A:62A-21, which provides, in pertinent part:

> In addition to any other right of action or recovery otherwise available under law, whenever any law

> enforcement officer, firefighter, or member of a duly incorporated first aid, emergency, ambulance, or rescue squad association suffers any injury, disease or death while in the lawful discharge of his official duties and that injury, disease or death is directly or indirectly the result of the neglect, willful omission, or willful or culpable conduct of any person or entity, other than that law enforcement officer, firefighter, or first aid, emergency or rescue squad member's employer or co-employee, the law enforcement officer, firefighter, or first aid, emergency, ambulance or rescue squad member suffering that injury or disease . . . may seek recovery and damages from the person or entity whose neglect, willful omission, or willful or culpable conduct resulted in that injury, disease or death.

The plain and extremely broad language of the statute appears to have abolished the fireman's rule by allowing a firefighter recovery for any injury that "*directly or indirectly*" is the "result of the *neglect* . . . of *any* person or entity." (emphasis added). Indeed, the only Supreme Court of New Jersey case to even mention the fireman's rule after the statute was passed noted in dicta that "[b]ecause the Legislature has, in effect, abolished the firefighters' rule in New Jersey, this case will probably be the last in which this Court will consider an application of the rule." *Boyer v. Anchor Disposal*, 638 A.2d 135, 136 (N.J. 1994) (citation omitted).[3] Since *Boyer*, at least two other courts have also suggested in dicta that section 2A:62A-21 abolished the fireman's rule in New Jersey. *See James v. Arms Tech., Inc.*, 820 A.2d 27, 48 (N.J. Super. Ct. App. Div. 2003); *Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245, 260 n.10 (D.N.J. 2000).

Despite acknowledging the *Boyer* dicta, the Appellate Division, in the only New Jersey case to have considered the continuing viability of the fireman's rule after N.J. Stat.

---

3. The Supreme Court in *Boyer* did not need to address the continuing viability of the New Jersey fireman's rule because the case concerned an accident that occurred before the statute was passed, and because the Court also found that, in any event, the pre-statute rule did not bar the claim at issue. *Boyer*, 638 A.2d at 139.

Ann. § 2A:62A-21 was passed, held in *Kelly* that the statute *did not* abolish the rule. In *Kelly*, the plaintiff firefighter sought damages for injuries he sustained when he tripped on a curb when responding to a fire allegedly caused by the defendant's negligence. The Appellate Division held that the New Jersey Legislature did not intend to do away with the fireman's rule in its entirety by passing section 2A:62A-21, but only intended to restore the rule to its pre-*Rosa* state — that is, to "afford protection to a firefighter injured as a result of the negligence unrelated to and independent of, the onset of the fire. It was not intended to make a homeowner responsible for a firefighter's injuries when the only negligence present related to the start of the fire itself." *Kelly*, 764 A.2d at 1034-35.

Careful review of the opinion in *Kelly* leaves little if any doubt that the Appellate Division based its interpretation of section 2A:62A-21 neither on the language of the statute nor upon relevant legislative history (which, as the Appellate Division recognized, does not exist), but instead explicitly based its interpretation solely on public policy considerations. *Id.* The Appellate Division reasoned that if the statute indeed abolished the fireman's rule, giving injured firefighters a cause of action against individuals who negligently started a fire, "the scope of potential liability would be virtually unlimited." *Id.* at 1034. Thus, it concluded, it was "highly unlikely that the Legislature would have intended to enlarge the scope of a property owner's liability" as well as providing a harmful incentive for property owners to "delay summoning aid out of fear of incurring liability to a responding firefighter." *Id.*

Because the Supreme Court of New Jersey has never interpreted section 2A:62A-21 (and the passing dictum in *Boyer* was not interpretation), our task, in reviewing the District Court's interpretation of that statute, is to predict how the Supreme Court would rule on this question of New Jersey law. *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93 (3d Cir. 1996). Ordinarily, in so predicting, "[t]he rulings of intermediate [state] appellate courts must be accorded significant weight." *Id.* We are not bound by the interpretations of intermediate state appellate tribunals, however, if other sources present "a persuasive

indication that the highest state court would rule otherwise." *Id.*

Our review of the plain and extremely broad language of section 2A:62A-21 leads inexorably to the conclusion that the New Jersey Legislature has abolished the fireman's rule. The statute explicitly gives a firefighter a right of action against any party who "directly or indirectly" caused his or her injury through simple "neglect," and there is no language which even hints that this was not what the Legislative intended to do.[4] Despite the arguable merit of the public policy concerns it expressed in *Kelly*, the Appellate Division did not even attempt to base its holding on the language of the statute.

Accordingly, we find that the plain language of section 2A:62A-21 constitutes, in and of itself, a "persuasive indication" that the Supreme Court of New Jersey would not follow *Kelly*, but would instead conclude that the fireman's rule no longer precludes tort claims by a firefighter against persons who negligently started the fire that injured him or her. Thus, Roma's negligence claims against Vaspoli and J.A. Jones are not barred by the fireman's rule, and the District Court's grant of summary judgment in their favor will be reversed.[5]

---

4. The only exception, inapplicable here, is if the injury is caused by the firefighter's employer or co-employee.

5. In light of our holding that the New Jersey fireman's rule does not preclude Roma's negligence claims against Vaspoli and J.A. Jones, we need not address Roma's contention that the District Court erred in concluding that there was insufficient evidence to create a triable issue of fact as to whether Vaspoli's or J.A. Jones's conduct was so egregious as to fall under the common law exception to the fireman's rule for "willful and wanton conduct." *See Mahoney v. Carus Chem. Co., Inc.*, 510 A.2d 4, 12 (N.J. 1986). Our review of the record, however, has yielded no evidence that suggests that either Vaspoli's or J.A. Jones's conduct was "willful and wanton" under New Jersey law. *See McLaughlin v. Rova Farms, Inc.*, 266 A.2d 284, 293 (N.J. 1970) (for conduct to be willful and wanton, "it must appear that the defendant with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result").

15

**B.**

While we will reverse the District Court's grant of summary judgment to Vaspoli and J.A. Jones on Roma's negligence claims, we will affirm the District Court's grant of summary judgment to the federal defendants. The FTCA expressly provides, in 28 U.S.C. § 2401(b), that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ." Similarly, 28 U.S.C. § 2675(a) provides that "[a]n action shall not be instituted upon a claim against the United States" for damages caused by "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing . . . ." In light of the clear, mandatory language of the statute, and our strict construction of the limited waiver of sovereign immunity by the United States, we have held that the requirement that the appropriate federal agency act on a claim before suit can be brought is jurisdictional and cannot be waived. *Livera v. First Nat'l State Bank of New Jersey*, 879 F.2d 1186, 1194 (3d Cir. 1989).

"Although an administrative claim need not propound every possible theory of liability in order to satisfy section 2675(a), . . . a plaintiff cannot present one claim to the agency and then maintain suit on the basis of a different set of facts." *Deloria v. Veterans Admin.*, 927 F.2d 1009, 1011-12 (7th Cir. 1991) (citations and internal quotations omitted). In other words, notice in the form of an administrative claim "satisfies section 2675's requirement . . . if the claimant (1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim." *Tucker v. United States Postal Serv.*, 676 F.2d 954, 959 (3d Cir. 1982).

Roma does not dispute that the amended administrative claim he filed with the Navy on April 14, 1998 set forth as the only basis for his claim that the NAES Lakehurst firefighter's negligent instruction that he remove his SCBA caused his injuries. Neither his initial nor his amended

administrative claim alleged that the United States or its employees caused his injuries by negligently failing to prevent the fire. Roma argues, however, that his allegation in the initial administrative claim that his injuries were caused by the Hangar No. 1 fire gave the Navy sufficient notice that it also had to investigate potential negligence on the part of federal employees in failing to prevent the fire and, therefore, satisfied 28 U.S.C. § 2675(a)'s administrative exhaustion requirement.

We disagree. The facts concerning how the fire started and any negligence by federal employees in failing to prevent it are entirely distinct from the conduct involved in supervising the firefighting operations, including the NAES Lakehurst firefighter's instruction to Roma to remove his SCBA. In other words, the allegation that an NAES Lakehurst firefighter negligently caused Roma's injuries by ordering him to remove his SCBA did not provide any notice to the United States that it not only had to investigate the way the firefighting was handled by federal employees, but that it also had to engage in a much broader investigation concerning whether the negligence of other, non-firefighter, federal employees may have contributed to the start of the fire itself. Accordingly, while we will reverse the District Court's grant of summary judgment in favor of Vaspoli and J.A. Jones for their alleged negligence in starting or failing to prevent the fire, we will affirm the District Court's dismissal of the analogous claim against the federal defendants for lack of jurisdiction.

## C.

Finally, Roma contends that the District Court erred in holding that his remaining, properly exhausted claims against the federal defendants were precluded by New Jersey's workman's compensation scheme because, under New Jersey law, he was a "special employee" of the NAES Fire Department on the night of the hangar fire. Specifically, Roma argues that his limited role in fighting the hangar fire did not satisfy the test for being a special employee because the federal defendants did not pay his wages and did not have the power to hire or fire him. Neither of these elements, however, is part of the three-part

special employee test promulgated by the Supreme Court of New Jersey in *Volb v. G.E. Capital Corp.*, 651 A.2d 1002, 1004-05 (N.J. 1995). Accordingly, we will affirm the District Court's grant of summary judgment in favor of the federal defendants on the remaining claims against them.

Under New Jersey's workmen's compensation scheme, N.J. Stat. Ann. § 34:15-1, *et seq.*, "an employee's exclusive remedy against [his] employer for ordinary work injuries is a statutory remedy without regard to fault. In return, the employee forgoes a common law tort remedy." *Gore v. Hepworth*, 720 A.2d 350, 353 (N.J. Super. Ct. App. Div. 1998); *see* N.J. Stat. Ann. § 34:15-8 (acceptance of workmen's compensation "shall be a surrender by the [employee] . . . of [his] rights to any other method, form, or amount of compensation"). In addition to barring tort claims against an employer for employment injuries, New Jersey law also bars tort claims against a plaintiff's co-employee for allegedly negligent actions in the course of his employment. N.J. Stat. Ann. § 34:15-8.[6] The workmen's compensation statute also expressly provides that its benefits and limitations apply to volunteer firefighters, and provides the same measure of protection to volunteer firefighters as it does to paid firefighters. N.J. Stat. Ann. § 34:15-43; *Ohrel v. Continental Cas. Co.*, 350 A.2d 310, 318 (N.J. Super. Ct. Law Div. 1975).

It is well settled under New Jersey law that an employee may have two employers for purposes of the workmen's compensation scheme — a primary employer and a "special" employer — and is barred from bringing a tort lawsuit against either employer. *Volb*, 651 A.2d at 1006; *Gore*, 720 A.2d at 353. Obviously, because Roma was not directly employed by the NAES Fire Department, his properly exhausted negligence claims against the federal defendants for their alleged negligence in supervising him on the night of the fire and instructing him to remove his

---

6. N.J. Stat. Ann. § 34:15-8 provides, in part: "If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong."

SCBA are only barred by the workmen's compensation statute if the NAES Fire Department may be considered his "special employer" under New Jersey law.

In *Volb*, the Supreme Court of New Jersey established a three-prong test for determining whether a defendant should be considered a "special employer" for workers' compensation purposes. 651 A.2d at 1004-05. Under the test, an employee is a special employee of the borrowing employer if: "(a) The employee has made a contract of hire, express or implied, with the special employer; (b) The work being done is essentially that of the special employer; and (c) The special employer has the right to control the details of the work." *Id.* at 1005. Although some New Jersey lower courts have considered two additional elements — "(d) the special employer pays the employees wages; and (e) the special employer has the power to hire, discharge or recall the employee," *Kelly v. Geriatric & Med. Servs., Inc.*, 671 A.2d 631, 633 (N.J. Super. Ct. App. Div.), *aff'd*, 685 A.2d 943 (N.J. 1996) — other cases have minimized the importance of these two additional factors. *See, e.g., Santos v. Standard Havens, Inc.*, 541 A.2d 708, 712 (N.J. Super. Ct. App. Div. 1988) (whether special employer paid employee's wages is not determinative of employment relationship).

The Supreme Court of New Jersey has emphasized, however, and most other New Jersey cases considering the issue have reiterated, that "the most important factor in determining a special employee's status is whether the borrowing employer had the right to control the special employee's work." *Volb*, 651 A.2d at 1005. There can be little doubt that the District Court correctly concluded that Roma's work fighting the November 24, 1997 fire for the NAES Fire Department rendered him a paradigmatic example of a special employee under *Volb*'s three-part test.

As to the first *Volb* prong — whether Roma had an express or implied contract with NAES — an employee has an implied contract with a special employer if "the employee consents to the special employment relationship . . . [and] voluntarily submit[s] to the employer's direction and control." *Antheunisse v. Tiffany & Co., Inc.*, 551 A.2d 1006, 1008 (N.J. Super. Ct. App. Div. 1988) (citations omitted). In

19

his deposition testimony, Roma conceded that he consented to the special employment relationship on the night of the hangar fire, and that he voluntarily submitted to the direction of the NAES Fire Department officers and personnel who were directing the firefighting operation.

Moving to the second prong, it is readily apparent that the work performed by Roma — fighting the Hangar No. 1 fire — was "essentially the work of" the NAES Fire Department. New Jersey courts have articulated the relevant question as whether the work done by the plaintiff "was an integral part of the regular business" of the borrowing employer, *Rossnagle v. Capra*, 318 A.2d 25, 30 (N.J. Super. App. Div. 1973), or whether "there is a functional integration of [the] respective operations" of the lending and borrowing employers. *Santos*, 541 A.2d at 711. Under either articulation of the test, rendering assistance in fighting a fire at NAES Lakehurst under a mutual aid agreement which required each fire department to help the other upon request renders the work of one fire department "essentially the work of" the other.

Finally, as to the all-important third prong — whether the NAES Fire Department had the right to control Roma as he was combating the hangar fire — there is little or no dispute that the NAES Lakehurst Fire Department had the authority to and did control Roma's activities. First, the mutual aid agreement expressly provided that "the senior officer of the fire department of the requesting service shall assume full charge of the operations." Second, when the East Dover Fire Department responded to NAES Lakehurst's call for assistance on November 24, 1997, Roma's commander, Lieutenant Cheblowski, expressly instructed him to follow the instructions of the NAES firefighters directing the fire control effort. Finally, Roma himself testified that at all times he followed the orders of NAES Fire Department officers and other personnel, and that following such orders caused his injuries.

Accordingly, we will affirm the District Court's grant of summary judgment in favor of the federal defendants dismissing Roma's claims based on the NAES firefighter's instruction that he remove his SCBA before proceeding onto the hangar roof — the only claim against the federal

defendants as to which Roma properly exhausted his administrative remedies.

### III.  CONCLUSION

For the foregoing reasons, we will reverse that portion of the District Court's September 25, 2002 order granting Vaspoli Custom Builders, Inc.'s and J.A. Jones Management Services, Inc.'s motions for summary judgment and remand for further proceedings consistent with this opinion. We will, however, affirm that portion of the District Court's order granting the federal defendants' motion for summary judgment.

A True Copy:
     Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*