225 N.J. Super. 16 (1988)
541 A.2d 708
ANA SANTOS, AS ADMINISTRATRIX AD PROSEQUENDUM FOR THE HEIRS-AT-LAW OF ALBINO SANTOS, DECEASED; ANA SANTOS, AS ADMINISTRATRIX OF THE ESTATE OF ALBINO SANTOS, DECEASED, AND ANA SANTOS, INDIVIDUALLY, PLAINTIFF-APPELLANT,
v.
STANDARD HAVENS, INC., DEFENDANT-APPELLANT, AND RIVERDALE QUARRY CO., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 22, 1988.
Decided May 13, 1988.
*18 Before Judges MICHELS, SHEBELL and GAYNOR.
William H. Sheil argued the cause for appellant Ana Santos.
Joseph G. Murray argued the cause for appellant Standard Havens, Inc. (Morley, Cramer, Tansey, Haggerty & Fanning, attorneys; Thomas F. Tansey, of counsel; Joseph G. Murray, on the brief).
Patrick J. McAuley argued the cause for respondent Riverdale Quarry Co. (Connell, Foley & Geiser, attorneys; Patrick J. McAuley, of counsel; Patrick J. McAuley and Brian T. Murnane, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Plaintiff Ana Santos, as Administratrix ad prosequendum for the heirs-at-law of Albino Santos, deceased; Ana Santos, as Administratrix of the Estate of Albino Santos, deceased; and Ana Santos, Individually, and defendant Standard Havens, Inc. *19 (Standard Havens), pursuant to leave granted by this court, appeal from a summary judgment of the Law Division entered in favor of defendant Riverdale Quarry Co. (Riverdale) in this action seeking to recover damages as a result of the wrongful death of her husband, Albino Santos (decedent).
The record submitted on appeal establishes that Riverdale, a wholly-owned subsidiary of Hess Brothers, Inc. (Hess Brothers), is engaged in the business of producing crushed stone and asphalt products at its Riverdale, New Jersey plant. Hess Brothers is an engineering and contracting firm, specializing in highway construction and heavy industrial site work and is a member of the Associated General Contractors of New Jersey. Pursuant to a collective bargaining agreement, Hess Brothers obtained its labor force exclusively through the Laborers' International Union of North America, Heavy and General Laborers' Locals 472 and 172, while Riverdale, also a union shop, obtained its labor force from Local 734 (general laborers, heavy equipment operators) and Local 560 (teamsters union for truck operators).
Notwithstanding the fact that Riverdale and Hess Brothers each drew its labor force from different unions, Hess Brothers' employees regularly performed maintenance and other work for Riverdale at its Riverdale, New Jersey plant. Ronald H. Hess (Hess), Vice-President and Operations Manager of Riverdale, would contact Dick Winters, Hess Brothers' general supervisor, on a regular annual basis and arrange for Hess Brothers' foreman Manuel Silva (Silva) and his crew to work at Riverdale while the plant was closed for winter maintenance. Prior to the winter of 1984, Silva and his crew had been engaged to dismantle various aspects of the Riverdale plant and to construct an office.
According to Hess, instead of transferring the Hess Brothers' employees to Riverdale's payroll, the parties followed an established procedure whereby Hess Brothers would pay Silva and his laborers their union wages and then "backcharge" *20 Riverdale through invoices. The crew was kept on the Hess Brothers' payroll because it was "easier to work the paperwork." Since the men received their paychecks directly from Hess Brothers, Hess Brothers was responsible for withholding all necessary taxes and Union contributions. Invoices were then periodically sent to Riverdale in accordance with work hours recorded on Hess Brothers "Daily Time Reports." An invoice sent by Hess Brothers to Riverdale for the period from February 6 through 10, 1984, indicates that decedent was credited with 40 working hours for this period and that Riverdale was billed accordingly at an hourly rate of $23.38. A breakdown of this hourly rate subsequently provided to Riverdale by Phyllis Howell, Hess Brothers' office manager, indicates an allocation of $11.80 for decedent's hourly wages, $4.48 for insurance and taxes, $3.05 for union welfare and pension contributions, and $4.05 for "overhead".
In 1977, Riverdale purchased a large pollution control structure which captures and controls dust generated in the production of asphalt, commonly referred to as a "baghouse." The structure was purchased from Standard Havens, a manufacturer and distributor of heavy machinery. In or around January 1984, Riverdale decided to replace this structure with another model. Accordingly, arrangements were made for Hess Brothers' foreman Silva and his crew to begin dismantling the baghouse during the first week of February, 1984. The Hess Brothers' crew consisted of laborers Jose Valente and decedent. The daily time sheets and invoices show that Silva, Valente and decedent had also performed a number of other maintenance tasks at Riverdale from January 2 through 27, 1984.
As a matter of routine procedure, Hess delegated supervisory responsibility over the dismantling of the baghouse to Forrest (Bucky) Rodda, the Riverdale asphalt plant manager. Although the proofs show that both Hess and Rodda intermittently checked on the progress of Silva and his crew, as they had done in the past, it was Rodda who actually told Silva what needed to be done and it was Rodda to whom Silva would go if extra *21 manpower was required. While Silva and his crew would generally work by themselves, Rodda would come to their assistance if, for example, a crane operator was needed. Silva, however, did not have the authority to directly order Rodda's men to work for him. At the commencement of the job, Silva was given a set of blueprints to follow in dismantling the baghouse. Although neither Hess nor Rodda gave Silva or his crew any particular instructions as to how to perform the work, it is uncontroverted that Hess and Rodda supervised the dismantling of the baghouse.
On February 6, 1984, apparently the first day of the dismantling process, decedent suffered fatal injuries when his leg was severed by a screw conveyor while he was cleaning out the baghouse dust hopper. Although Rodda was not present when the accident occurred, five of his Riverdale employees were also working on the baghouse along with Silva's crew at the time.
After the accident, dependency benefits were paid by New Jersey Manufacturers Insurance Company, the workers' compensation carrier for Hess Brothers, to decedent's widow, plaintiff, in accordance with the New Jersey Workers' Compensation Act, N.J.S.A. 34:15-1 et seq. Thereafter, plaintiff instituted this action to recover damages for the wrongful death of her husband against Riverdale, for its alleged negligence in failing to provide a safe place to work or to adequately warn decedent of the dangerous conditions that existed, and against Standard Havens, as manufacturer of the allegedly defective machine. Riverdale moved for summary judgment on the ground that decedent was a special employee of Riverdale, and therefore, plaintiff's recovery of benefits from Hess Brothers' compensation carrier barred any subsequent action at common law against Riverdale. Counsel for all parties agreed that the matter presented "a question of law for the court." The trial court held that decedent was a special employee of Riverdale when fatally injured and, as such, plaintiff's common law action against Riverdale was dismissed. We granted plaintiff and Standard Havens leave to appeal and consolidated both appeals.
*22 We have studied the record in light of the arguments presented and are satisfied that the trial court properly granted summary judgment in this matter and that all issues of law raised are clearly without merit. R. 2:11-3(e)(1)(E). We therefore affirm the judgment under review substantially for the reasons expressed by Judge Donald S. Coburn in his oral opinion of October 30, 1987. We are satisfied that the trial court correctly analyzed and decided the matter in light of the principles discussed in Blessing v. T. Shriver and Co., 94 N.J. Super. 426 (App.Div. 1967). See also Caicco v. Toto Bros., Inc., 62 N.J. 305, 309-312 (1973); Marcus v. Eastern Agricultural Ass'n, Inc., 32 N.J. 460 (1960), rev'g on dissent 58 N.J. Super. 584, 596 (App.Div. 1959); Smith v. E.T.L. Enterprises, 155 N.J. Super. 343, 349-353 (App.Div. 1978).
We emphasize that whether we apply the "right to control" test or the "relative nature of the work" test, we are convinced that in the totality of the circumstances the trial court properly found that decedent was a special employee of Riverdale at the time of the fatal accident so as to preclude plaintiff from instituting this common law wrongful death action against Riverdale. See Carpenter v. Hooker Chem. & Plastics Corp., 553 S.W.2d 356 (Tenn. Ct. App. 1977); A.J. Johnson Paving Co. v. Industrial Com'n, 82 Ill.2d 341, 45 Ill.Dec. 126, 412 N.E.2d 477 (1980); Charlton v. United Steel Erectors, 704 S.W.2d 273 (Mo. Ct. App. 1986).
Primarily, it is well-settled that:
Under the control test, the actual exercise of control is not as determinative as the right of control itself. Mahoney v. Nitroform Co., Inc., 20 N.J. 499, 506 (1956). This is so because in many instances the expertise of an employee precludes an employer from giving him any effective direction concerning the method he selects in carrying out his duties. [Smith, 155 N.J. Super. at 350].
Accord Marcus, 58 N.J. Super. at 597. Although in the instant case, Riverdale placed a good deal of discretion in Silva to control the actual performance of the dismantlement, it is clear that Riverdale had the right to exercise a higher degree of authority if the job was not performed to its satisfaction. The *23 situation is thus distinguishable from the facts of Blessing, supra, where the plaintiff, a security guard at the defendant's foundry, was found not to be a special employee of the defendant because he was solely accountable to the detective agency supervisor at the job site and was required during his rounds to call in to the agency at designated check points. Here, we note that while decedent may have taken his orders from foreman Silva, it is undisputed that Silva was directly accountable to Rodda and had no authority to order Rodda's men to work for him. If Silva needed additional manpower or equipment, he was required to obtain them through Rodda. Moreover, although Silva was only given a set of blueprints to follow, along with general instructions issued by Hess and Rodda, it is evident that no further directions were necessary since Silva had performed various dismantlements at the plant on other occasions.
Furthermore, the "relative nature of the work" test points strongly to a legal conclusion that decedent was a special employee of Riverdale. To qualify as a special employee under this test, the claimant must ordinarily demonstrate (1) substantial economic dependence upon the putative employer and (2) that there is a functional integration of their respective operations. Smith, 155 N.J. Super. at 352. See also Caicco, 62 N.J. at 310. In order to make such a determination, the following factors are generally considered:
... the character of the claimant's work or business  how skilled it is, how much of a separate calling or enterprise it is, to what extent it may be expected to carry its own accident burden,  and its relation to the employer's business, that is, how much it is a regular part of the employer's regular work, whether it is continuous or intermittent, and whether the duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of a particular job. [Buchner v. Bergen Evening Record, 81 N.J. Super. 121, 131 (App.Div. 1963)].
Here, Riverdale, which is in the business of producing crushed stone and asphalt products, must maintain and repair the structures and equipment used in the production of its products. Since the baghouse is necessary for the production *24 of asphalt, its maintenance and repair would be an integral aspect of Riverdale's regular work. As such, it logically follows that the process of dismantling the baghouse in order to make room for a newer structure is also a part of Riverdale's regular work and was clearly undertaken here for the exclusive benefit of Riverdale.
Moreover, it is significant to note that the work performed by the decedent constituted a part of the continuing service arrangement between Hess Brothers and Riverdale whereby Silva and his crew were regularly loaned to Riverdale to perform maintenance related work at the plant every winter, and decedent had in fact been steadily employed at Riverdale for more than one month prior to the fatal accident. Thus, under the "relative nature of the work test" we find that the existence of a special employment relationship is demonstrated by a functional integration of the decedent's work on the baghouse and Riverdale's regular course of business and the fact that Silva and his crew would, in a real sense, become economically dependent upon Riverdale each winter.
We would also point out that the fact that Hess Brothers paid decedent does not undercut in any way the trial court's finding that decedent was a special employee of Riverdale. In circumstances such as these, the name on the paycheck may have little probative value in determining whether a special employment relationship exists. As Professor Larson explained:
[t]he element of who pays the employee shrinks into comparative insignificance in lent-employee problems, because the net result is almost invariably that the special employer ultimately pays for the services received and the employee ultimately gets his wages. [1C Larson, Workmen's Compensation Law § 48.30, p. X-XXX-XXX (1986)].
Here, although Riverdale was billed in an amount in excess of decedent's actual hourly wage, the difference between the amount paid decedent and the amount charged Riverdale was earmarked for insurance, union dues and welfare contributions. The difference did not reflect any actual profit to Hess Brothers *25 for performing the work or even lending Riverdale the employees. To the contrary, Riverdale simply reimbursed Hess Brothers the actual costs incurred for its union employees. Moreover, the fact that Riverdale was billed for labor on an hourly basis indicates a degree of control consistent with a special employment relationship. If Hess Brothers had agreed to dismantle the baghouse for a flat price, Riverdale would have had little concern that a particular employer was not pulling his weight, provided the job was done on time and to Riverdale's satisfaction. However, the fact that Hess Brothers billed Riverdale on an hourly basis creates a strong inference that Riverdale could fire or replace any of Silva's crew if it felt they were not earning their wages. In any event, the fact that Hess Brothers paid decedent's salary and then "backcharged" Riverdale did not, in itself, create a genuine issue of fact as to whether decedent was a special employee of Riverdale.
Finally, the term "employee" as used in N.J.S.A. 34:15-36 is to be defined liberally in order to bring as many cases as possible within the scope of the Workers' Compensation Act so that the cost of industrial accidents may be passed along as part of the cost of the product or service provided. Had plaintiff made a claim for dependency benefits under our Workers' Compensation Act against Riverdale, as decedent's special employer, Riverdale undoubtedly would have been held responsible for such benefits. Plaintiff, however, having recovered such benefits in full from Hess Brothers, is not now entitled to a more restrictive interpretation of the term "employee" because she has also instituted a common law wrongful death action against Riverdale. In this regard, we think it worthy of repeating the reasoning adopted by Judge Larner in Rutherford v. Modern Transp. Co., 128 N.J. Super. 504, 511 (Law Div. 1974), quoting 101 C.J.S. Workmen's Compensation, § 918, p. 364 (1958):
The rule that the compensation act is to be liberally construed in favor of its applicability is not altered by the fact that a plaintiff believes he can establish negligence and brings a civil suit for damages; the act is to be liberally *26 construed, so as to include all services that can reasonably be said to be within it, not only when the injured person seeks its protection, but when he attempts to have himself excluded from the coverage of the act.
Contrary to the view of our dissenting colleague, the fact that Hess Brothers paid plaintiff the full benefits to which she was entitled for the work-related death of decedent under our Workers' Compensation Act is neither evidence of the absence of a special employee-employer relationship between decedent and Riverdale, nor does it bar Riverdale from showing that such a relationship existed at the time of decedent's death. The dissent ignores the fundamental principle that "an employee, for the purposes of work[ers'] compensation, may have two employers, both of whom may be liable to him in compensation, and a recovery against one bars the employee from maintaining a common law tort action against either for the same injury." Blessing v. T. Shriver and Co., supra, 94 N.J. Super. at 429-430. If Riverdale has not paid plaintiff under the Workers' Compensation Act, it is only because she elected not to seek recovery from Riverdale under the Act.
Accordingly, the summary judgment under review is affirmed.
SHEBELL, J.A.D., dissenting.
I fail to see how the majority in denying the worker's Estate the right to sue Riverdale for damages resulting from the wrongful death of the worker is furthering the intent of the Legislature as expressed in the Workers' Compensation Act. The majority's efforts to demonstrate that the decedent might have been a special employee of Riverdale is, in my opinion, misplaced in these circumstances where the workers' compensation court has entered judgment exclusively against Hess Brothers as the employer of the deceased worker. The best evidence of the relationship between Hess Brothers and Riverdale, and indeed it was a close relationship, is that Hess Brothers was satisfied to pay the full amount of the workers' compensation benefits without regard to a determination of *27 whether a special employment relationship existed with Riverdale.
Under N.J.S.A. 34:15-7 an employer is relieved of liability to its employee for negligence "[w]hen employer and employee shall by agreement, either express or implied ..., accept the provisions of this article compensation for personal injuries to, or for the death of, such employee by accident arising out of and in the course of employment...." Under N.J.S.A. 34:15-9 there is a conclusive presumption, inferred from the fact of employment, that the parties accept the provisions of the Workers' Compensation Act and its scheduled benefits. There is, however, no evidence of a legislative intent to favor an employer seeking protection from liability for negligence under N.J.S.A. 34:15-7. Such protection was legislated as a quid pro quo  strict liability in Workers' Compensation in exchange for immunity from common law liability for negligence. The decision of the majority here results in the anomaly that Riverdale has avoided responsibility both under the Workers' Compensation Act and for common law negligence.
I do not disagree with the rationale of the court in Rutherford v. Modern Transp. Co., 128 N.J. Super. 504 (Law Div. 1974). I am, however, convinced that in circumstances such as this where factually the issue of special employment is a close question, we should not invoke doctrines of liberal construction to defeat a worker's claim where the employing entities have ostensibly resolved the employment issue between themselves. We must not lose sight of the fact that it is Riverdale which has the burden of demonstrating the viability of the defense of the exclusive remedy of workers' compensation which it invokes. If resolution of the issue at any time hung in the balance, the scale was tipped by Hess Brothers exclusively accepting responsibility as employer under the Workers' Compensation Act.
I would hold that the defendant has not sustained its burden and reverse the granting of summary judgment.