

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-19-2004

# Marino v. Ind Crating Co

Precedential or Non-Precedential: Precedential

Docket No. 02-4429

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Marino v. Ind Crating Co" (2004). *2004 Decisions.* Paper 951.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/951

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

No. 02-4429
_____

LAWRENCE MARINO;
LAURA MARINO,
Appellants

v.

INDUSTRIAL CRATING CO. d/b/a
INDUSTRIAL CRATING AND
RIGGING COMPANY;
OSCAR J. BOLDT CONSTRUCTION
COMPANY;
MARCAL PAPER MILLS
_____

Appeal from the United States District
Court for the District of New Jersey
(D.C. Civil No. 99-cv-04002)
District Judge:  Honorable
Dickinson R. Debevoise
_____

Argued November 20, 2003

Before:  RENDELL, BARRY and
MAGILL*, Circuit Judges.

(Filed February 19, 2004)
_____

*Honorable Frank J. Magill, Senior
Circuit Judge for the Eighth Circuit,
sitting by designation.

Robert M. Miele          [ARGUED]
Burke, Miele & Golden
100 Washington Avenue
P.O. Box 397
Suffern, NY  10901
    Counsel for Appellants

Stephen B. Fenster
Valerie A. Vladyka       [ARGUED]
Gallo Geffner & Fenster
115 West Century Road
Paramus, NJ  07652
    Counsel for Appellee
_____

OPINION OF THE COURT
_____

RENDELL, Circuit Judge.

Lawrence Marino, an electrician employed by Kleinknecht Electric Company ("KEC"), was injured on August 7, 1998, in an accident during construction at the Marcal Paper Mills in Elmwood Park, New Jersey.  At issue in this appeal is whether Marino, who was working with riggers on a task associated with the construction project at the time of his injury, should be deemed a "special employee" of the rigging company under New Jersey law.  Because our jurisdiction is based on the diversity of citizenship of the parties,[1] and New Jersey law applies,[2]

_____

[1] The District Court had jurisdiction over Marino's negligence action under 28 U.S.C. § 1332(a)(1), as Marino is a citizen of New York, ICR is a New Jersey corporation with its principal offices in Mahwah, New Jersey, and the amount in

our task is to predict how the courts of New Jersey would resolve this issue if presented with these facts.

We do not write on a clean slate, as the courts of New Jersey have spoken on this general issue several times, and we have recently addressed this issue applying New Jersey law. The application of the law to the specific facts of Marino's work situation requires a careful analysis of the principles developed in the case law related to "special employment" situations. The District Court held that, applying those principles, Marino was a "special employee" of the defendant, Industrial Crating and Rigging Company ("ICR"). Since special employee status precludes the bringing of a negligence action against the special employer, the District Court granted summary judgment in favor of ICR and dismissed Marino's action with prejudice. We predict that the New Jersey Supreme Court would conclude otherwise, and will accordingly reverse and remand so that the matter may proceed to trial.

---

controversy exceeds $75,000. We have jurisdiction over the appeal of the District Court's final order pursuant to 28 U.S.C. § 1291.

[2]As the District Court's jurisdiction over this matter was based on diversity, the law of the forum state, New Jersey, applies on the substantive issue of special employment. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78 (1938).

I.

In order to gain a contextual orientation, before exploring the facts, we will review the basic principles underlying this issue. The New Jersey courts have made it clear that special employer cases like this one are set against the backdrop of New Jersey's statutory workers' compensation scheme, set forth in the Workmen's Compensation Act ("WCA"), N.J. Stat. Ann. §§ 34:15-1 to -142. See, e.g., Santos v. Standard Havens, Inc., 541 A.2d 708, 712 (N.J. Super. Ct. App. Div. 1988) (discussing the WCA and its definition of employees who are covered by the Act). Therefore, we must first have an understanding of the WCA and the policies behind it.

In New Jersey, employees who are injured while working are to receive workers' compensation benefits without regard to fault. Gore v. Hepworth, 720 A.2d 350, 353 (N.J. Super. Ct. App. Div. 1998). When an employee receives workers' compensation benefits, he forgoes the right to seek additional tort remedies from his employer. Id. This waiver of remedies is explicitly detailed in the exclusivity provision of the WCA itself: "Such agreement [to accept WCA benefits] shall be a surrender by the parties thereto of their rights to any other method, form or amount of compensation or determination thereof than as provided in [the WCA], and shall bind the employee . . . as well as the employer . . . ." N.J. Stat. Ann. § 34:15-8.

The WCA was enacted as a

mechanism that would protect employees who are injured in the workplace. However, another important objective of the WCA was to pass along the costs of industrial accidents "as part of the cost of the product or service provided." Santos, 541 A.2d at 712. Thus, New Jersey courts have liberally construed the term "employee" in the WCA "in order to bring as many cases as possible within [its] scope." Id. This is true when a plaintiff seeks its protection, as well as "when he attempts to have himself excluded from the coverage of the act." Id. at 713 (quoting Rutherford v. Modern Transp. Co., 320 A.2d 522 (N.J. Super. Ct. Law Div. 1974)).

In construing the term "employee" liberally, New Jersey courts have made it clear that an employee may have several employers for WCA purposes, any one of which may be held liable for workers' compensation benefits when that employee is injured.[3] Blessing v. T. Shriver & Co.,

---

[3]An employee with multiple employers for WCA purposes is essentially free to choose the one employer from whom he will receive his workers' compensation benefits. Once he has been awarded benefits, he may not seek identical benefits from another one of his employers, nor may he pursue a common law tort action against any of his employers. N.J. Stat. Ann. §§ 34:15-7, -8. However, if multiple employers are found, the employer who is ordered to pay the benefits may seek pro rata contribution from the other employers if they are joined

228 A.2d 711, 713 (N.J. Super. Ct. App. Div. 1967). The result of this broad definition is that the acceptance of workers' compensation benefits from one employer will preclude a common law tort action brought by the employee against another employer. Id. The courts of New Jersey, in analyzing situations in which an employee might be found to have, in addition to his primary employer, an additional "special employer," have developed a five-factor test. This test, based on a treatise on workers' compensation, was first articulated and explained in Blessing.

The five factors of the test are summarized as follows: 1) whether there is an express or implied contract for hire between the employee and the employer; 2) whether the work being done is that of the employer; 3) whether the employer has a right to control the details of the work; 4) whether the employer pays the employee's wages or benefits; and 5) whether the employer can hire or fire the employee. Blessing, 228 A.2d at 713 (relying in part on 1A Arthur Larson, Workmen's Compensation § 48.00, at 710 (1966)). None of these factors is necessarily dispositive, and not all five must be satisfied in order for a special employment relationship to exist. Id. at 715. However, several courts have emphasized the

---

as parties to the compensation proceedings. See Conway v. Mister Softee, Inc., 225 A.2d 707, 708-09 (N.J. Super. Ct. App. Div. 1967), aff'd, 239 A.2d 241 (N.J. 1968).

importance of the third factor – the right to control. See, e.g., Volb v. Gen. Elec. Capital Corp., 651 A.2d 1002, 1005 (N.J. 1995) (stating that "the most important factor in determining a special employee's status is whether the borrowing employer had the right to control the special employee's work"); Mahoney v. Nitroform Co., 120 A.2d 454, 458 (N.J. 1956) (describing the right to control as "essential to the employment relation[ship]"); Blessing, 228 A.2d at 713-14 (noting that the "sheer weight of authority" regarding the predominant element of the special employment test "is undoubtedly on the side of 'control'"). It is within this statutory and precedential framework that we analyze whether Marino was a special employee of ICR at the time of his injury.

## II.

Keeping these principles in mind, we will move on to consider the factual setting of Marino's work and the accident. At the time of his injuries, Marino was a journeyman electrician and a member of Local 363 of the International Brotherhood of Electrical Workers ("IBEW"). The accident occurred while he was employed by KEC as an electrician who was assigned to work on a project at Marcal's Elmwood Park plant. Marcal had contracted with KEC to perform the electrical work associated with a major construction project that would expand Marcal's facilities and add new machinery to its existing plant. KEC, in turn, had subcontracted with ICR for its assistance with the installation and rigging of heavy electrical switchgear sections, which had to be hoisted to the second floor of a building on the site and moved to their point of installation. While the subcontract specifically delegated to ICR the rigging work involved in the project, KEC bore ultimate responsibility for the completion of this and all other aspects of the project pursuant to its contract with Marcal.

The two unions involved in the Marcal project – the IBEW representing the electricians, and the International Association of Bridge, Structural, and Ornamental Iron Workers ("Iron Workers' Union") representing the riggers – have had a written agreement in place since 1950 outlining the types of work that fall within the jurisdiction of electricians, and the types that are properly assigned to riggers, or iron workers. However, as the District Court noted, the work performed by electricians and riggers on a project like the one at the Marcal site can often overlap. The parties have conceded that the unions commonly encounter situations, often involving the moving and installation of heavy electrical equipment, in which the work at issue is not easily classified as falling within the exclusive jurisdiction of either electricians or riggers.

To deal with this kind of hybrid situation, and to avoid costly and time-consuming jurisdictional disputes, the two unions over time developed an informal practice of creating what they term "composite crews," using an equal number

4

of workers from both unions, to work together to perform the discrete hybrid tasks. The parties refer to this practice as the "composite crew agreement," although no written agreement exists, and there is no specific understanding as to how tasks are to be performed or which union is in charge of overseeing the tasks. Because the hoisting and moving of the switchgears at the Marcal site involved both the movement and installation of electrical equipment, as well as the rigging and hoisting of that equipment, supervisors from the two companies working on the site determined that it fell into this category of hybrid work. Thus, based on the composite crew agreement, they formed a group of four workers – two from each union – to perform the discrete task of lifting and moving the three switchgear sections involved. This all occurred on August 7, 1998, the day of the accident.

Prior to that date, Marino had been performing electrical work for KEC at the Marcal site for several weeks. On August 7, Marino spent the morning performing work that was typically assigned to him as an electrician. Sometime before 11 a.m., Marino's KEC supervisor instructed him and another KEC electrician, Pat DiNardo, to work with two ICR riggers, Michael and Patrick Ruane, to move the switchgear sections to the point of installation. ICR did not request Marino by name or approach him specifically to ask him to work on the composite crew. Marino's testimony reveals that he had worked on composite crews moving switchgears in the past, but had never before worked on one with ICR riggers at the Marcal site.

All parties agree that Michael Ruane of ICR took charge, directing the composite crew and instructing Marino and DiNardo about details such as where to place their hands and in which direction the team should move. The crew moved the first section of the equipment into place without incident. The accident occurred while the crew moved the second section of the switchgear. After hoisting the second piece up to the second floor, the crew disconnected the rigging and positioned four metal skates beneath the switchgear so that they could roll it to its final position, where it was to be installed. As the men were rolling the switchgear across the floor, they reached a point where the skates supporting the switchgear stopped rolling and a skate had to be repositioned. At the time, DiNardo was supporting the left side of the switchgear, which was to be lifted with a jack, and Patrick Ruane was on the right side. Michael Ruane told Marino to place a skate under the switchgear, halfway down its ten-foot length, and to stand between the switchgear and a nearby wall in order to do so when the others raised the unit. As the crew lifted the switchgear and Marino began to reposition the skate, the switchgear began to tilt. Before the men could stabilize it, the 4,600-pound switchgear fell over, pinning Marino against the wall and leaving him with serious and permanent injuries. At the time of the accident, Marino had been working on the composite crew for

approximately two hours.

During the course of the project at the Marcal site, ICR made no contributions to Marino's wages, benefits, or payroll taxes, nor did it pay any fee to KEC as compensation for Marino's assistance with this one discrete task. As we have indicated, there was no written agreement governing the composite crew arrangement that was being employed at the time of the accident, and the oral decision to combine the unions' forces was general in nature. It did not indicate that KEC electricians became "employees" of ICR while they served on composite crews, or vice versa, nor did it declare that ICR supervisors and employees would have the right to control such situations, or vice versa. Further, there could be no formal assignment of employees of one company to the other because each was signatory to a collective bargaining agreement that prohibited it from assigning, transferring, or subletting employees to another company that did not recognize the relevant union as the collective bargaining representative of those employees.

Marino received workers' compensation benefits from his employer, KEC, and then instituted a personal injury action against Marcal and ICR in the United States District Court for the District of New Jersey on August 24, 1999.[4] The complaint alleged that the accident was primarily caused by the negligence of ICR, in its failure to select safe methods for moving the switchgear, and secondarily caused by the negligence of Marcal, in its failure to adequately supervise ICR's conduct at the construction site. At the conclusion of pretrial discovery, ICR filed a motion for summary judgment,[5] arguing that, under New Jersey law, Marino was a "special employee" of ICR at the time of the accident, and was therefore precluded by the WCA from pursuing a negligence action against ICR.

After hearing oral argument on the motion, the District Court granted the motion and issued a written opinion on August 21, 2001. In granting ICR's motion, the District Court focused on Marino's statements in interrogatories and depositions, which indicated that he knew that while he served on the composite crew, he would be "under the supervision, direction and control of [ICR]." In the District Court's view, these statements indicated that Marino consented to being

---

[4]Marino's wife was also a plaintiff in the action, asserting a separate claim for loss of consortium. For ease of reference, we will refer to Marino as the plaintiff and appellant in this opinion, but the impact of our decision here will extend to cover his wife's claim as well.

[5]Marcal also filed a motion for summary judgment, but its motion was denied. Marcal prevailed at trial, where the jury determined that Marcal was negligent, but that its negligence was not the proximate cause of Marino's injuries. Thus, no issues related to the claims against Marcal are raised on appeal.

loaned to ICR, thus forming an implied employment contract. The District Court also found that Marino was performing "a job that could only lie within ICR's proper purview," and that his actions were directed and defined by ICR employees. Thus, although the court noted that ICR did not pay Marino and that it could not hire or fire him, the District Court found that, looking at all five factors together, Marino should be deemed a special employee of ICR when he was injured. Marino filed this timely appeal.

### III.

### A.

We exercise plenary review over a district court's decision to grant summary judgment. Detz v. Greiner Indus., Inc., 346 F.3d 109, 115 (3d Cir. 2003). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper where no genuine issue of material fact exists, and where, viewing the facts in the light most favorable to the party against whom summary judgment was entered, the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Applying this standard to the facts before us, we find that no genuine issues of material fact remain. However, as we will discuss below, an analysis of the undisputed facts under New Jersey law regarding special employer situations leads us to reach a conclusion here that is the opposite of that reached by the District Court.

### B.

There are essentially two types of fact patterns around which the case law in this area revolves – the "Manpower" or employment agency cases, in which the employee is almost universally held to be a "special employee" of the business employer that has hired him as a temporary helper,[6] and all other work situations in

---

[6]For examples of "Manpower" cases, see Kelly v. Geriatric & Med. Servs., Inc., 671 A.2d 631 (N.J. Super. Ct. App. Div.), aff'd, 685 A.2d 943 (N.J. 1996) (finding that a nurse working for a temporary nursing services provider was a special employee of the convalescent center where she was placed based on the satisfaction of the five-factor Blessing test); Antheunisse v. Tiffany & Co., 551 A.2d 1006 (N.J. Super. Ct. App. Div. 1988) (finding that a temporary worker placed at Tiffany's to work during the holiday season was a special employee of Tiffany's due to the existence of an implied contract for hire, the nature of the assigned tasks, and Tiffany's right to control the details of her work); Chickachop v. Manpower, Inc., 201 A.2d

which an employee is actually working on a job or project of someone who is not technically his employer. In this latter class of cases, the way in which the Blessing factors are viewed to apply, given the specific facts involved, will dictate the result. As Marino's situation clearly falls within the latter category, it is instructive to review the key cases applying New Jersey law to this type of fact pattern as the first step in our analysis.

We begin with Blessing itself. In Blessing, the plaintiff was an employee of a detective agency who was regularly transferred to new locations, as directed by his primary employer, to provide security services. 228 A.2d at 712. He was injured while patrolling the defendant's foundry, where he had been working for a few months prior to his accident. Id. The court developed the five-factor test described above and made the following determinations: although a benefit of the plaintiff's work accrued to the defendant, the work was being done in furtherance of the detective agency's contract with the defendant; although the defendant had incidental control over the plaintiff, the detective agency retained significant control over most aspects of his work; no consensual relationship or contract existed between the plaintiff and the defendant; the plaintiff's salary was paid by the detective agency; and the defendant had no power to hire or fire the plaintiff. Id. at 712, 716. Thus, the court concluded that the plaintiff was not a special employee of the defendant at the time of his injury, and his tort action was allowed to proceed. Id. at 718.

Our reading of Blessing teaches us several important lessons. Besides learning the specific elements of the test for finding a special employment relationship, we are instructed that "the criteria for the determination of an employee-employer relationship are not exclusive, but must be rationalized and applied so that each case may be considered and determined upon its own particular facts." Id. at 715 (internal quotation omitted). Additionally, the court indicated in Blessing that "a showing of a deliberate and informed consent by the employee" is required before an express or implied contract for hire will be found, satisfying the first factor of the test and weighing in favor of finding a special

90 (N.J. Super. Ct. Law Div. 1964) (finding that a temporary worker performing industrial work at a company's steel plant was a special employee of the borrowing company based on the satisfaction of the Larson test and factors similar to those listed in Blessing); see also Whitehead v. Safway Steel Prods., Inc., 497 A.2d 803 (Md. 1985) (finding that a temporary worker placed at a company to perform menial industrial work was a special employee of that company based on a five-factor test that resembles the test set out in Blessing). We will not discuss this class of cases at length here, as we are not dealing with a situation involving a temporary placement agency and, thus, the analysis of the instant case will not be derived from the "Manpower" decisions.

8

employment relationship that would bar a tort action. Id. at 716.

The teachings of Blessing were echoed in subsequent decisions of the New Jersey Superior Court. In Santos, the plaintiff was the wife of an employee of one company who was killed while working at a subsidiary company's facility. 541 A.2d at 709. The court applied the principles discussed in Blessing to find that a special employment relationship existed, emphasizing that the subsidiary had the right to control the employee under a continuing service agreement that provided for the regular borrowing of employees by the subsidiary. Id. at 711-12. The Santos court explained that under the Blessing test, "the actual exercise of control is not as determinative as the right of control itself." Id. at 711 (quoting Smith v. E.T.L. Enters., 382 A.2d 939, 942 (N.J. Super. Ct. App. Div. 1978)). Also, although the court gave less weight to the factor that focuses on who paid the employee's wages, it found that the fee paid by the subsidiary to the primary employer in Santos was essentially a reimbursement for the wages and costs associated with the borrowed worker's labor. Id. at 712.

A few years later, in Murin v. Frapaul Construction Co., 573 A.2d 989, 991 (N.J. Super. Ct. App. Div. 1990), the plaintiff was injured while operating a cement mixer truck on a construction project. Although he was performing work on a project run by the defendant, he was employed by Consolidated Steel and Aluminum Fence, a company that provided certain services – including both workers and equipment – to be rented by other organizations. Id. at 991, 994. The court discussed the five factors listed in Blessing and found that Consolidated retained control over the plaintiff's work, that the rental agreement between the companies explicitly stated that it was not a contract for hire, that the defendant could not hire or fire the plaintiff, that Consolidated continued to pay the plaintiff's wages, and that the work performed by the plaintiff was "entrusted to him by the general employer [Consolidated]." Id. at 993-94. Under these facts, the Superior Court concluded that there was no special employment relationship. Id. at 994.

The Murin court provided a helpful explication as to the analysis to be followed with respect to each of the Blessing factors. For instance, in describing the first factor – a contract for hire – the court indicated that the employee must consent to such a contractual relationship because he "loses certain rights along with those he gains when he enters a new employment relationship." Id. at 993. Thus, a "showing of deliberate and informed consent by the employee" is necessary before a special employment relationship will be found. Id. As to the second factor – whose work is being performed – the court noted that "absent evidence to the contrary, there is an inference that the employee remains in his general employment so long as, by the service rendered another, he is performing the

9

business entrusted to him by the general employer." Id.

The New Jersey Superior Court had another occasion to engage in a special employment analysis in Pacenti v. Hoffman-La Roche, Inc., 584 A.2d 843 (N.J. Super. Ct. App. Div. 1991). There, the plaintiff was injured while performing work for a second employer pursuant to a written contract providing for his primary employer to supply maintenance personnel to the borrowing company. Id. at 844. Due to the existence of a factual dispute, the court stopped short of reaching a decision on the special employment question. Id. at 847. But before remanding, the court noted that several factors cut heavily in favor of finding a special employment relationship, including the fact that the plaintiff had been under the control of the borrowing company and doing its work for several years. Id. at 845-46.

The most recent guidance from the New Jersey Superior Court on the five-factor Blessing analysis is provided in Gore v. Hepworth, 720 A.2d 350 (N.J. Super. Ct. App. Div. 1998). There, the court found that an employee of one trucking company, who was injured while riding along with an employee of another trucking company where the plaintiff had recently been employed as well, was a special employee of that second company at the time of the accident. Id. at 352. The court applied all five factors from Blessing, noting that the right to control is the most important one. Id. at 353-54. After determining that an oral agreement between the two related trucking companies existed, providing for the exchange of employees between the two companies, and that the plaintiff had consented to an employment relationship with the second company, the court concluded that the Blessing test was satisfied. Id. at 354. Regarding the fifth factor of the test, the court stated that "the right to control whether plaintiff would be assigned to work for [the special employer] is the equivalent of the power to discharge him." Id.

In its only decision explicitly confronting this issue, the New Jersey Supreme Court briefly addressed the question of whether a special employment relationship existed in Volb. Although much of the court's decision focused on other issues, the court did engage in a short discussion of Blessing and its application by the Superior Court before finding that an employee of one construction company was the special employee of an affiliate company for which he was performing construction work. 651 A.2d at 1003-04. Significantly, looking beyond actual control exercised by the special employer, the court focused on the special employer's right to control the plaintiff's work. Id. at 1005. Also, treating the case as an easy one, where the facts obviously indicated that a special employment relationship existed, the court did not mention or rely upon the final two Blessing factors – the payment of wages, and the power to hire or fire. But neither did the court explicitly reject those factors or indicate that they are improper

considerations in making a special employment determination.[7]

And finally, we recently confronted a New Jersey special employment situation ourselves in Roma v. United States, 344 F.3d 352, 354 (3d Cir. 2003), where the plaintiff was a township firefighter who was injured while fighting a fire at a United States Naval Air Engineering Station. He was called to assist at the site of the fire pursuant to a written mutual aid fire fighting assistance agreement between his fire department and the Navy fire department associated with the station where the fire occurred. Id. at 355. The written agreement had been in place for approximately twenty years and provided that each party would assist the other when requested, if the requested fire fighters and equipment were available, and that when such assistance was called for, "the senior officer of the fire department of the requesting service shall assume full charge of the operations." Id. On those facts, we held that the plaintiff fire fighter was a special employee of the Navy fire department when he was injured. Id. at 363.

We analyzed three of the five Blessing factors as the New Jersey Supreme Court did in Volb, but also mentioned the other two arguably less important factors in passing. Id. at 364. We determined that the provision giving the special employer the right to control the details of the work involved in joint undertakings pursuant to the mutual aid agreement satisfied the most important factor in the special employment test. Id. Regarding the contract for hire, we noted that the plaintiff conceded that he had voluntarily "consented to the special employer relationship" and "submitted to the direction of" the special employer. Id. Finding that the work being done was essentially that of the special employer, we noted that the relevant question was "whether the work being done by the plaintiff was an integral part of the regular business of the borrowing employer, or whether there is a functional integration of the respective operations of the lending and borrowing employers." Id. at 365 (internal quotations omitted). Both entities were engaged in firefighting at the same site, thus leading to the conclusion that their forces and operations were integrated at the time. Id. Our conclusions regarding each of these prongs found clear support in the written agreement governing the

---

[7]Following Volb, the New Jersey Superior Court continues to discuss the final two factors of the Blessing test. For example, in Gore, which was decided three years after Volb, the Superior Court discussed all five of the factors that were developed in Blessing. 720 A.2d at 353-54. Additionally, we note that in Kelly, which was a "Manpower" case that was decided a year after Volb, the Superior Court listed and discussed all five factors in its special employment analysis. 671 A.2d at 633. The New Jersey Supreme Court subsequently affirmed the Superior Court's decision in Kelly "for the reasons expressed in the opinion" of the Superior Court. 685 A.2d at 943.

11

employee-borrowing situation at issue in Roma.

## C.

Consistent with this line of relevant decisions, the District Court and the parties focus our attention on three key questions under Blessing: 1) Was there a contract for hire?; 2) whose work was Marino doing?; and 3) did ICR have the right to control Marino's work? The District Court found, and ICR now argues, that the prominent factors of the Blessing test, expressed in those three questions, are satisfied here for the reasons we have already described. On appeal, Marino urges that none of the three factors are satisfied. Regarding the first, he asserts that his brief work on the composite crew was not sufficient to indicate consent to an implied agreement – either on the part of Marino or ICR – that they would enter into a temporary employer-employee relationship. On the second factor, Marino contends that the work being done was in furtherance of KEC's contract with Marcal, or at the very least was the work of both KEC and ICR. And as to the third factor, Marino argues that despite the nominal actual supervision of the work by Michael Ruane of ICR, ICR had no right to control Marino, nor could it hire or fire him, affect his pay, or dictate how and when he should do his job.

We find Marino's arguments to be very persuasive. First, with respect to the issue of the "contract for hire," the only contract here was the "composite crew agreement" – a decades old informal union cooperation understanding that bears no resemblance to a contract for hire. If anything, this agreement seems to dispel the notion that Marino was actually contracted for by ICR to do this work. Unlike every other fact pattern in which a "special employment" relationship has been found to exist, there was no ongoing contractual arrangement for the use by ICR of Marino's services or those of KEC electricians generally. See Roma, 344 F.3d at 355 (describing an established agreement governing situations in which one fire department would borrow employees from another fire department); Gore, 720 A.2d at 354 (describing an agreement by which employees of one company would be temporarily hired by the other company when work for either company declined); Pacenti, 584 A.2d at 844-46 (describing a contract providing for one company to supply maintenance workers to another company, along with a five year period during which an implied contract for hire between the plaintiff and defendant company was likely formed); Santos, 541 A.2d at 709-10 (describing an "established procedure" whereby employees of one company would regularly be assigned to work another company's plant when their own company closed for the winter). To the contrary, the composite crew agreement at most establishes a joint undertaking. It does not include specific provisions creating a procedure for one union to borrow or temporarily hire workers associated with the other union for a specific purpose, as in Pacenti, nor does it form an understanding about such a relationship between two parties that will be resorted to

12

regularly in the future, as in Roma.

Further, we find little support for the proposition that the "implied" agreement found to exist by the District Court can satisfy the "contract for hire" element under Blessing. See Murin, 573 A.2d at 993 (emphasizing the importance of the consent requirement and asking whether the employee and both employers understood that the employee would become employed by the special employer for a given purpose); Blessing, 228 A.2d at 716 (indicating that "a showing of a deliberate and informed consent by the employee" is required before an implied contract will be found); Chickachop, 201 A.2d at 95 (describing the typical "Manpower" case where the employee knows he will be "hired out to special employers" and he voluntarily accepts such employment). To find that such an implied contract exists here would seem to emasculate the contractual requirement that the New Jersey courts have actually applied relatively strictly. The absence of an explicit contract here, along with the absence of any other indications that Marino knowingly formed an implied contract for hire with ICR when he joined the composite crew, cuts heavily against a finding that Marino was a special employee of ICR.

Next, as to the notion that Marino was doing ICR's work, we are not convinced that this element is as easily satisfied as the District Court's decision indicates. Given the case law described above, we understand that this factor requires us to look at the work actually being performed and conclude that a special employment relationship is established where the employee is doing work that is more accurately characterized as work of the special employer alone, as in the "Manpower" cases. See Antheunisse, 551 A.2d at 1008 (finding that a temporary worker's duties were "definitely part of [the temporary employer's] regular business," rather than the work of the temporary agency); see also Murin, 573 A.2d at 993 (stating that "absent evidence to the contrary, there is an inference that the employee remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer"). In the situations where no special employee relationship was found, such as Blessing, where Blessing's work for the defendant remained within the realm of his regular detective work, this was not the case.

The District Court reasoned that because KEC subcontracted with ICR to have ICR perform this work, it was ICR's work that was being done. But we think the issue is a bit more complicated than that. The work was essentially that of both KEC and ICR, in the sense that ICR was responsible for doing it under its subcontract with KEC, but KEC was ultimately responsible for this work pursuant to its contract with Marcal. Actually, the fact that electricians as well as riggers are routinely called upon to do this type of hybrid work seems to detract from, rather than support, the existence of a special employment relationship here.

13

The very fact that the composite crew was formed indicates that the task involved presented a situation that was not clearly the work of either riggers, or of electricians, alone. In fact, it appears to us that the task was as much the work of electricians as it was of riggers. We think that although Marino's work on the composite crew may have rendered a service that benefitted ICR in its work on the project, it ultimately served a purpose that was within KEC's responsibilities to Marcal under its general contract. We thus conclude that the work he performed should not necessarily be deemed to be the work of ICR, and might actually be characterized as more the work of KEC – because of its ultimate responsibility for it – than that of ICR. In any event, this factor does not point toward the existence of a special employment relationship as ICR urges.

And finally, we view the issue of the "right to control" to require more than an examination of who assumed control over the task of the composite crew. Rather than looking to actual control that was exercised by the putative special employer, we have noted that the focus of the case law is on the right to control the employee in his work. See, e.g., Roma, 344 F.3d at 365 (describing the "all-important third prong" of the test as "whether [the special employer] had the right to control" the plaintiff); Santos, 541 A.2d at 711 (citing Mahoney and emphasizing that the actual exercise of control "is not as determinative as the right of control itself"). Looking beyond

Marino's statements and the evidence related to Michael Ruane's instructions as the task was unfolding, we would have difficulty concluding that ICR had a right to control Marino's work as a member of the crew.[8] For instance, if the KEC electricians were scheduled to take a coffee break before the crew was finished moving the switchgear, nothing in the record indicates that the ICR workers or supervisors would have had any right to prevent Marino and the other KEC electrician on the crew from stopping their work to take that break. In fact, there is no indication in the record that ICR had the right to control anything with respect to Marino's work on the crew, only that its employees took control over details that were "incidental in nature and of no

_____

[8]We emphasize that, with respect to the control analysis, this case is factually distinguishable from Roma, despite ICR's urging that Roma dictates the outcome of this appeal. As we noted above, Roma involved a written agreement providing for the borrowing of fire fighters from one department by another. 344 F.3d at 355. Moreover, the same written agreement explicitly indicated that, when a joint effort was required, the borrowing department would have the right to assume full control over the fire fighters from both units. Id. Thus, the control prong of the test was easily resolved in Roma and clearly cut in favor of finding a special employment relationship. Id. at 365. Here, there is no such provision in the "composite crew agreement."

particular legal significance." Id. at 716.

Related to the "right to control" element of the test, the final two Blessing factors, while perhaps not viewed as being as important as the first three, can nonetheless be helpful in resolving any doubt that may remain in close cases. See, e.g., Murin, 573 A.2d at 994 (discussing the final two factors in a case where the first three factors did not clearly support a finding that a special employment relationship existed); Blessing, 228 A.2d at 713 (same). Here, both factors strongly point toward the absence of a special employment relationship. Marino was paid by KEC for the duration of his work at the Marcal site. ICR made no contributions to his wages or benefits, nor did it offer any payment to KEC in exchange for Marino's work on the composite crew.

Similarly, KEC retained the right to hire or fire Marino throughout the project. ICR had no right to select which electricians were assigned to the composite crew, and it had no power to remove Marino from the Marcal project. Although ICR asserts that it could have requested that KEC replace Marino with another worker if his performance was deficient, we do not think that to be equivalent to the power to hire or fire Marino under these circumstances. We are not persuaded by ICR's reliance on statements made by the New Jersey courts in cases where the temporary employers of the plaintiffs retained some right to screen workers before they were placed and could also unilaterally decide to remove workers

from their facilities. See, e.g., Gore, 720 A.2d at 354 (finding that such power was the "equivalent of the power to discharge," where the other Blessing factors were satisfied as well); Kelly, 671 A.2d at 636 (same). The power to potentially ask KEC to have Marino removed from the composite crew is not, without satisfaction of the other Blessing factors, sufficient to support a finding that ICR had a right to control Marino or that a special employment relationship existed in this case.

Considering all five factors together, as they relate to the facts before us, we conclude that Marino was not a special employee of ICR at the time of his injury. We believe this conclusion to be entirely consistent with the decisions of New Jersey courts applying the special employment test. In most of those decisions, the courts faced situations that were characterized by a degree of structure and formality – whether in the form of a temporary placement agency and its practices, or a formal contractual relationship governing the details of the parties' relationship – that is simply lacking here. While we recognize that cases are not required to include a Manpower agency or a written employment contract in order to satisfy the Blessing test, we are reluctant in this case to impose special employer status on what appears to reflect the opposite extreme – an informal, customary operating procedure of union laborers, combining to work together on a discrete aspect of a job, while retaining their own employer-

15

employee relationships.

We note that care must be taken as we examine any given set of facts to determine whether a plaintiff falls within the WCA's broad definition of "employee" – in other words, whether a special employment relationship exists – because the ramifications of that determination can be quite significant. See Murin, 573 A.2d at 993 (applying the Blessing factors strictly "because the employee loses certain rights," including the right to sue his special employer, "when he enters a new employment relationship"). As we have already discussed, if such a relationship is found, a potential source of recovery for injury through a negligence action could be deemed waived by the plaintiff when he accepts workers' compensation benefits from his primary employer. Therefore, although the New Jersey courts have indicated that the term "employee" should be defined liberally in keeping with the broad goals of the WCA, Santos, 541 A.2d at 712, we will not enlarge the concept of a special employer beyond those situations that fit within the parameters of the case law surveyed above. Here, we do not believe that the New Jersey courts would countenance converting a very temporary and seemingly routine combination of labor forces to accomplish a discrete task into a special employment situation.

IV.

In light of the foregoing discussion, we conclude that the District Court erred when it determined that Marino was a special employee of ICR at the time of the accident, and was thus precluded from pursuing a negligence action against ICR. Accordingly, we will REVERSE the District Court's order granting summary judgment in favor of ICR and REMAND the case to the District Court for further proceedings consistent with this opinion.

_____